VILLAGE OF BELLWOOD, a Municipal Corporation of the State of Illinois, et al., Plaintiffs,

v.

DWAYNE REALTY et al., Defendants.

No. 75 C 3588.

United States District Court,
N. D. Illinois, E. D.

Dec. 28, 1979.

F. Willis Caruso, Chicago, Ill., for plaintiffs.

Eugene Lieberman, Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

This suit arises out of a dispute concerning the sale of residential realty in the Village of Bellwood, a Chicago suburb. The village, joined by a civic organization and six individuals who acted as testers of practices in real estate offices, allege that prior to September 15, 1975, and to the date of plaintiffs' complaint, in violation of the Fair Housing Act of 1968, a real estate brokerage, its owner, and two salespersons, had engaged in racial steering of prospective purchasers of residential real estate.

These allegations are denied; the case has been heard by the court without a jury. And on the evidence received, the real estate broker and his salespersons challenge the standing of the village, the civic organization, and of the individuals, to bring this suit under the federal laws; they contend that even if some or all of the plaintiffs have standing to sue in this case, the evidence does not prove any pattern or practice of racial steering. With the contentions of the parties before it, the court will now resolve this dispute.

### I.

A. The Facts

Plaintiffs are the Village of Bellwood, the Leadership Council for Metropolitan Open Communities, Edward Powell, Charles Elliott, Vicki Simmons, Sandra T. Sharp, Mary P. Powell, and Joyce Perry. The defendants are Dwayne Realty, a licensed real estate brokerage; John Cavicchioni, a licensed real estate broker; Pat Kloth and Camella A. Sedivy, licensed real estate salespersons. Bellwood is generally regarded as a good community in which to raise a family; it has good schools and convenient public transportation. It is located near a number of plants, factories and centers of employment opportunities. At the time this suit was filed in October 1975, the village, at least some parts of it, was a racially integrated community. However, beginning sometime in the early 1970's, a section bound by Eastern Avenue on the west, 1st Avenue on the east, Grand Avenue on the north, and St. Charles Road on the south, known as the Zuelke Drive area, began to become concentrated with homes purchased by members of the Negro race. This development caused certain people in and around Bellwood to believe that the evolving residential phenomenon was the product of racial steering by real estate brokers.

Among such persons were Bellwood homeowners who later decided to cooperate with the Leadership Council, an Illinois not-for-profit corporation whose purpose is civic and educational activities aimed at the elimination of discrimination in housing opportunities within the six-county Chicago metropolitan area. The Council has a membership, among whom are persons who volunteer to be testers of sales practices of real estate brokers located in the six-county area.

A tester has no interest in buying residential housing; his objective is to go to a real estate broker's office and there engage in conversation for the purpose of discerning the attitude, practices, and policies of the broker or his salespersons in order to ascertain whether they are engaging in racial steering or activities that violate the Fair Housing Act of 1968. The tester, before going on such a mission, is given instructions by a person knowledgeable in the practices of people who sell residential real estate. The instructions include suggestions as to the kinds of questions to ask the broker or salesperson; the way to act, so as to deal with the real estate person in a way that he or she will reveal policies or prac-

tices about which the tester can later testify. In some instances, the tester is to use an assumed name, say that he or she is interested in purchasing a home within a stated price range, and tell such falsehoods as may prevent the real estate broker or salesperson from learning the identity of the tester, or the purpose for his or her initiation of the supposed real estate transaction.

Dwayne Realty has its offices in Westchester, a Cook County community near the Village of Bellwood. Its sole owner is John Cavicchioni, one of the three individual defendants, a licensed Illinois real estate broker who, at the time of the trial in this case, had had more than 14 years experience in selling real estate in southwestern Cook County, Illinois. Among his salespersons at the time of this controversy were defendants Pat Kloth and Carmela A. Sedivy, licensed Illinois real estate salespersons whose only interest in Dwayne realty sales were their share of commissions earned. During the period relevant to this law suit, Dwayne did real estate business in an area comprised of the Chicago suburbs of Hillside, Broadview, Maywood, Berkley, Westchester, and the Village of Bellwood. The brokerage house participated in a real estate listing service that included these communities. The listings of real estate for sale in this area were maintained in a listing book that was available at the real estate office for customers to look at, and thus be shown residential housing which could be purchased. The real estate salespersons who worked for Dwayne were trained in the procedure that was to be followed in showing property listed in the listing book. And these salespersons were required to know the provisions of Illinois laws which prohibit discrimination in the showing and sale of residential real estate.

Sometime in the late summer or early fall of 1975, supporters of the Leadership Council, some of whom were homeowners in Bellwood, developed the belief that Dwayne Realty, its owner Mr. Cavicchioni, and salespersons of that brokerage, were involved in racial steering of persons who were prospective purchasers of residential real estate in the village. Representatives of the Council at about that time spoke with Mrs. Marian Montana, a Bellwood homeowner, who told them that early in August she called Dwayne Realty and asked for information concerning a townhouse in the village which her sister wanted to buy. She was given the requested information by telephone; then on Sunday, August 10, 1974, she said she went with her sister to Dwayne and spoke with Mr. Cavicchioni who, according to Mrs. Montana, said: "You don't want to buy in Bellwood. I don't even want to show you anything in Bellwood, because we are having trouble with the coloreds." [1] Thereafter, at the offices of the Leadership Council, four groups of testers were instructed on the questions they were to ask, and the statements they were to make, on visits to Dwayne Realty in order to determine whether that office and its salespersons were engaged in racial steering of prospective purchasers of residential real estate in the Village of Bellwood. It is the evidence of the tests, the testimony of four testers, and that of Mrs. Montana, on which plaintiffs mainly rely to prove that during the time in question defendants engaged in the practice of racial steering. This being so, a statement about these tests is necessary in order to understand the contentions of the parties.

The first one, after the contact Mrs. Montana said she and her sister had with Dwayne, was made by a Caucasian, Mr. Edward Brian Powell, Jr. who, on September 15, 1975, went to the real estate office with his wife and one of his children. Mr. Powell's interest in Dwayne Realty, and other real estate brokers, was his concern that he was being damaged by what he thought were their acts and conduct; he believed that the value of his home in Bellwood was being lowered; he had concluded that his friends and neighbors were moving

---

1. At the trial of this case, as part of plaintiffs' case in chief, Mrs. Montana gave this testimony. It appears on page 7 of the trial transcript.

out of the community, lowering the price of real estate generally, and causing devaluation of his property as a consequence. The Powells were served by Mrs. Sedivy. They told her they were from the Village of Hoffman Estates, a northwestern Chicago suburb; that they were in the market for a home either in Hillside, Westchester, Bellwood or Broadview; and that they wanted a three-bedroom brick home in the price range between $30,000 and $40,000; and that they could make a down payment of between $10,000 and $12,000.

Other than the name they gave, the statements the Powells made to Mrs. Sedivy were untrue. They did not live in Hoffman Estates, they were Bellwood homeowners; Mr. Powell, contrary to what he said, was not an executive employed in Hoffman's Estates, he owned his own business in the Village of Bellwood, an employment agency; they were not in the market for a home. In fact, all of the statements they made to Mrs. Sedivy were aimed at getting her to believe they were prospective home buyers; they intended to use the statements she made in testimony they expected to give in order to prove that Dwayne was engaged in racial steering of purchasers of homes in the Village of Bellwood. They acted in ways that would lead Mrs. Sedivy to believe they were racially biased.

Mrs. Sedivy gave every indication of believing the Powells. She told them that from what they had said concerning the price range of the home they were looking for, and the down payment they had for the purchase, they would most likely end up buying either in Broadview or Bellwood. She then took out a copy of Dwayne's multiple listing book, and the three sat down to determine the available homes within the price range and down payment the Powells had stated. Mr. Powell testified that early in their conversations with her, Mrs. Sedivy said that north of Roosevelt Road and Broadview, the housing is integrated, and that she would show them only south of Roosevelt Road. Shortly after this statement was made to them, he said that he and his wife picked out a home in the 200 block on Zuelke, in the Zuelke Drive area.

He said that when Mrs. Sedivy saw this, she hesitated; then his wife picked out a house on 32nd Avenue, a racially integrated area. He testified that Mrs. Sedivy told them that the 32nd Avenue address was next to Zuelke Drive which was also integrated; and that they, the Powells, would not want to live there. After that, Mrs. Sedivy gave them a number of listings; and at their request, she took them to see the homes. Six of these were in Bellwood, one in Westchester, and one in Broadview. Among the six Bellwood homes, two were in racially integrated neighborhoods. One was not far from the Powells' Bellwood address, 1111 S. 30th Avenue. Mr. Powell testified that Mrs. Sedivy, although not expressly asked to do so, did not take them to see either the house on Zuelke or the one on 32nd Avenue which they knew were located in racially integrated neighborhoods. Mrs. Powell was not called as a witness by the plaintiffs.

Mrs. Sedivy was called as a witness for defendants. She said that on a wall of Dwayne Realty's office, there hangs a copy of the law and the regulations of the state of Illinois which expressly prohibit discrimination against any person in the showing and sale of residential real estate. She said that even before she was hired, this law and the regulations were explained to her; and that Mr. Cavicchioni was emphatic in his insistence that the law and regulations be obeyed. She recalled the occasion when the Powells came to Dwayne Realty. It was on a Monday morning at about 10 a. m.; that they told her they were from Hoffman Estates; and they thought the home they had on the market had been sold. She remembered using a listing service book that contained the homes which were available in every community within the multiple listing area. It was from the listing book that she and the Powells picked out the homes she showed them. She denied refusing to show the home on Zuelke Drive, or the one on 32nd Avenue, explaining that because of the time limitation Mr. Powell had set, she could not take them the distance required to cover both locations. She said that the home in Broadview which she showed the

Powells was in a racially integrated community.

She was asked about 1020 Cernan in Bellwood which was in a racially integrated area. That home, she said, was shown just as Mr. Powell described in his testimony. Mrs. Sedivy explained that 1020 Cernan was built by the same contractor that built the Zuelke Drive home about which Mr. Powell testified. She denied telling the Powells that they would not want to live next to Zuelke Drive because it was an integrated area; and she denied telling them that north of Roosevelt Road and Broadview was integrated and that she would only show them south of Roosevelt Road. Mrs. Sedivy said she could not have made the remark attributed to her by Mr. Powell because it was well known that at the time of the Powells' visit to Dwayne, south of Roosevelt Road and Broadview was a racially integrated neighborhood in Bellwood. She was asked about 2621 11th Street in Broadview which she showed to the Powells, one they did not like. Mrs. Sedivy said that this was the same home she showed on September 28, 1975 to Mrs. Joyce Perry, a Negro tester who was also a Leadership Council volunteer.

The second test of Dwayne was made on September 19, 1975 by Ms. Sandra J. Sharp, a Negro woman who was neither a Bellwood resident nor homeowner in that community. She was employed by the Village of Maywood as a housing rehabilitation coordinator. She said the Leadership Council had asked her to run the test and she agreed because she supported the Council's philosophy. On the occasion when she visited Dwayne's offices, she spoke with Mr. Cavicchioni. She gave him a false name, saying that she was Irene Goldstin. She did this because she had told him that she knew nothing of the area around Bellwood; that she was from the far south side of Chicago; and she gave him an address and phone number, all of them false. Ms. Sharp said that she was concerned that otherwise Mr. Cavicchioni would have recognized her had she given him her true name. She told him she was looking for a three bedroom brick home within 30 minutes of the International Harvester Plant in Melrose Park. She said that Mr. Cavicchioni took out a multiple listing book and began to thumb through to select the listings for her. She testified that he did not give her the book; he held it himself so that she could not see the listings he took out, selected, and gave to her. She then asked about communities that were within a half hour of the International Harvester plant, and Mr. Cavicchioni said that these could be Maywood, Bellwood, or Broadview. He told her that Westchester, ordinarily considered an all white community, was north of the company she had mentioned; and that homes in Westchester ran very high in price, from $50,000 upward. She had told him that she wanted a home in the $30,000 to $40,000 price range. She talked with Mr. Cavicchioni about the characteristics of the communities in which she expressed an interest. He shared with her information about their schools, and the availability of public transportation.

When she was cross-examined, Ms. Sharp said that Mr. Cavicchioni told her she would be very happy were she to buy a home in the village of Bellwood. She said he gave her listings which she turned over to the Leadership Council. One of these was 530 Morris Street in Bellwood, a block away from 420 Morris which had been shown to the Powells by Mrs. Sedivy on September 15. She admitted being given the listing of 1012 Cernan in Bellwood, this was in the same block as 1020 Cernan which had also been shown to the Powells by Mrs. Sedivy. She said that the telephone number she gave Mr. Cavicchioni was not hers; she did not give him any address. Ms. Sharp admitted that she did not ask to be shown any of the homes; and that she did not make any other effort to communicate with Dwayne Realty after September 19, 1975 when she completed the test. Although she said she did not return to Dwayne, she had made in excess of 12 tests of other real estate brokerage offices in the greater metropolitan Chicago area for the Leadership Council.

Mr. Cavicchioni testified and said that in his real estate office all salespersons are licensed by the state of Illinois and are trained in the way they should treat prospective buyers, and what they should show people who come into the office. They are instructed to show all areas in the listing book without discrimination. They are told to show the book to all prospective buyers. This procedure, he said, has been in force at Dwayne as long as he has been doing business as a real estate broker. He himself does not show real estate listings. That is the function of the salespersons who are paid only from the commissions they earn by making a sale. He said it was the policy of his brokerage office to show and sell to Negro prospects homes located in Caucasian communities; and during the same time, his office showed and sold to Caucasians homes in what was considered to be racially integrated areas.

Mr. Cavicchioni recalled Ms. Sharp's visit to his office. He said she asked him about real estate in the $30,000 to $40,000 or $42,000 price; she questioned him about the type of schools in the community and said she was looking for a home close to her husband's place of work, International Harvester located north of the Dwayne office. He said she discussed with him other communities, and he explained to her that in Westchester, the price of homes were well above the $30,000 to $40,000 range she had mentioned; rather, they were well into the lower $50,000 to upper $50,000's. He said that all of her questions were answered by him, courteously; and when he was asked if he treated her as if she had a disease, he said he did not because it would have been foolish on his part to do so. He said she made no request of him that homes be shown to her; the matter of follow-up was turned over to Mrs. Sedivy; and that he believed attempts by his office to reach the woman who had given her name as Goldstin were not successful. He was asked about the testimony of Mrs. Montana; and he denied ever discouraging her and her sister from buying a townhouse in the Village of Bellwood. Mr. Cavicchioni said he made his living selling real estate in that community, as in others; and that it was the policy of his brokerage office to sell real estate to people of all races and ethnic backgrounds.

The third and fourth tests of Dwayne were made on the same day, September 28, 1975, by Mrs. Joyce Perry, a Negro woman who was at the time a homeowner in the Village of Bellwood, and by Mr. Charles Elliott, accompanied by a woman who feigned being his wife, both Caucasians who were also Bellwood homeowners. Mrs. Perry came to the real estate office alone, and was served by Mrs. Sedivy. She asked for listings of available homes which she could discuss with her husband and then communicate with Dwayne further, if they wanted to inspect any. She was told about a home in the Zuelke Drive area, one at 1012 Cernan the same one given to Ms. Sharp by Mr. Cavicchioni, and the address 420 Morris Street in Bellwood, the same home Mrs. Sedivy showed to the Powells when they tested Dwayne on September 15. In addition, Mrs. Perry was told about the availability of 2621 South Eleventh Street in Broadview, a home that Mrs. Sedivy had shown to the Powells. She was also given the listing of a house located in an area of Bellwood which at the time was considered an all-Caucasian neighborhood. When she was cross-examined, Mrs. Perry was asked a question that suggested the reason for the test she was conducting at Dwayne. She rejected the suggestion, saying, "I guess someone must have brought a charge against Dwayne Realty and they wanted information to substantiate [it]."

Mr. Elliott entered Dwayne's offices in the company of one of the plaintiffs, Mrs. Vicki Simmons, who did not testify in this case. They were served by Mrs. Pat Kloth, the other individual defendant. Both Mr. Elliott and Mrs. Simmons were residents of Bellwood. They told Mrs. Kloth that they were man and wife; and that they were looking for a three-bedroom brick house in the price range of $38,000 to $42,000, maximum. Mrs. Koth told them that this immediately put homes in Westchester out of their reach. He said that Mrs. Kloth was extremely polite and acted as if she was

cultivating him and his purported wife as prospective home buyers. Mrs. Kloth gave them eight listings of available homes. Among these was the 325 South 27th Street in Bellwood which had been given to the Negro tester, Mrs. Perry, the same day by Mrs. Sedivy. Mr. Elliott and his "wife" were shown 2621 South Eleventh Street in Broadview, the home about which Mrs. Perry was told that day by Mrs. Sedivy, and which had been shown on September 15 to the Caucasian testers, the Powells, also by Mrs. Sedivy. While Mrs. Kloth was distracted from her review of the listings, Mr. Elliott thought he was being offered a home located at 227 Zuelke Drive in Bellwood, and he took the listing from the book; but Mrs. Kloth told him that the home had been sold. She took the listing paper from him and threw it into a wastepaper basket. Mr. Elliott testified that he did not believe Mrs. Kloth's statement about the house on Zuelke; his testimony suggested the belief that Mrs. Kloth did not want them to see the home on Zuelke Drive because they were Caucasians.

Mrs. Kloth was called by defendants. She recalled the Sunday afternoon when Mr. Elliott and his "wife" came to Dwayne Realty. She testified to the conversation they had about the kind of home the couple said they wanted to buy. Mrs. Kloth's attention was called to the incident concerning the listing of 227 Zuelke Drive in Bellwood. She said that when Mr. Elliott showed her he had it in his possession, she took it from him to look at the address which at first did not mean anything to her, but she recognized the name of the owner. This fact made her recall that the home had been sold to Mrs. Cora Barber, a Negro woman whose husband was a Caucasian. The contract for the home had been entered into in June, 1975, and the transaction was closed in December the same year. Mrs. Kloth was shown a defense exhibit, a change of notice form dated September 4, 1975 which reported to the West Suburban Board of Realtors the fact that the property on Zuelke had been sold by Dwayne Realty. Mrs. Barber was a witness; she testified that in June 1975 she and her husband entered into a contract for the home in question, and that the transaction was closed in December of that year.

The testimony of the four testers and that of Dr. Pierre Devise, an acknowledged expert in modern urbanology, concluded plaintiffs' case in chief. Thereafter, defendants called five witnesses, two Negroes, two Caucasians, and an Asian who testified about their personal knowledge of the sales practices at Dwayne Realty during the time relevant to this dispute. They told of having been shown and purchasing residential real estate in certain of the southwestern suburban Cook County communities without any suggestion of racial steering by Dwayne personnel. The individual defendants themselves testified, each denied the testimony in which plaintiffs' witnesses impugned their conduct. Defendants introduced into evidence a summary of Dwayne's records showing homes sold by that brokerage between October 1, 1974 and October 31, 1975. These totaled forty-nine sales. Twelve were in the Village of Bellwood. Of these, seven were to Caucasians, three were to Negroes; one was to a family in which the wife was Caucasian, and the husband a Negro. One was to an Asian. None of the sales to Negroes was within the area known as Zuelke Drive. Among the other of the 49 transactions, one was in Hillside, a community generally considered all-Caucasian; and in this instance, the sale was to an Asian. One sale in August 1975 in Westchester, a community the parties agree was nonintegrated at the time of this dispute, was handled by Dwayne and the buyers were people from the Philippine Islands. Documents introduced in evidence concluded presentation of defendants' case.

In rebuttal, plaintiffs called Mr. Printes Gordon Bell, a Negro to whom Dwayne had shown a listing in Bellwood outside the Zuelke Drive area during the period in question, and who, after some litigation, purchased the home. They also called Mrs. Louise Lee, who was shown a home by Dwayne in Bellwood, outside the Zuelke area. Mrs. Lee testified that she later completed the purchase. Plaintiffs then re-

called Mr. Powell. This concluded the court's hearing of the evidence in the case.

### B. The Issues

Plaintiffs filed this suit under 42 U.S.C. § 1982 which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." They invoke the jurisdiction of this court pursuant to 28 U.S.C. § 1343(4), seek a declaratory judgment under 28 U.S.C. § 2201, and sue by virtue of 42 U.S.C. § 3612 which affords a civil action like this one in appropriate United States district courts, without regard to the amount in controversy. This statute is designed to enforce the rights granted by 42 U.S.C. § 3604 in which Congress has mandated that it shall be unlawful "[t]o . . otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin."

The evidence in this case discloses that no plaintiff: the village, the civic organization, or any of the complaining individuals, at any time during the period in question, was seeking to purchase or rent a dwelling. For this reason, defendants contend that none of the plaintiffs has any right granted by Section 3604 of Title 42; and therefore, plaintiffs all lack standing to bring this suit. Defendants insist that the Village of Bellwood not having been a person negotiating for the purchase or rental of a dwelling; the Leadership Council being similarly situated; and none of the individual plaintiffs having been either one seeking to purchase or rent a dwelling, cannot bring this suit. They argue that even if it could be said that plaintiffs, or some of them, have standing to bring this suit, their evidence, containing inherent contradictions, and having been refuted by the testimony of disinterested witnesses, does not prove the allegations that defendants, during the time in question, engaged in racial steering of persons who were seeking to buy residential real estate in the Village of Bellwood.

Plaintiffs, of course, contend otherwise. They argue that each plaintiff in this case has standing to bring this suit under the provisions of 42 U.S.C. §§ 1982 and 3612. They insist that the evidence heard by this court proves racial steering. Therefore, the court is presented with two issues. 1. Whether plaintiffs, some or all of them, have standing to bring this suit. 2. Whether the evidence proves, to the extent required by law, that defendants, during the period in question, engaged in the practice of racial steering of real estate customers in the Village of Bellwood.

### II.

### A. The Issue of Standing

In its constitutional dimension, standing imports justiciability; that is, whether a plaintiff has alleged a case or controversy between himself and the defendant within the meaning of art. III of our constitution. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The essence of the question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal—court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–499, 95 S.Ct. at 2205, quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In this case, plaintiffs' complaint, with the exception of the names of defendants, is identical as to its allegations as is the one in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) a suit that originated in this court. There, after reviewing the claim of racial steering said to have effectively manipulated the housing market in the described area, and had adverse effect on the Village of Bellwood, the Supreme Court held that Bellwood had standing to challenge the legality of the alleged conduct. 441 U.S. 91 at 111, 99 S.Ct. 1601. That holding is controlling here. The conduct alleged in *Gladstone, Realtors* is identical to the one in this case; the interest of the plaintiff village is the same. Consequently, it has standing to bring this suit. 99 S.Ct. 1601, 1614.

■ It is alleged in this complaint that as a result of defendants' conduct, the individual plaintiffs "have been deprived of the social and the professional benefits of living in an integrated society." In *Gladstone, Realtors* the Supreme Court had before it the same claims, for the same period of time, by these individual plaintiffs, but against different defendants. Pretrial discovery had disclosed that plaintiffs were, at the time in question, testers; but the Supreme Court proceeded on the showing that four of them resided within the target area in the Village of Bellwood that allegedly was adversely affected by what was claimed to be racial steering of prospective purchasers of residential real estate. The court, speaking through the opinion of Mr. Justice Powell, cited its earlier decision in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), and noted the importance of the "benefits from interracial associations". Then, referring to its recent statement that noneconomic injuries may suffice to provide standing, *Sierra Club v. Morton*, 405 U.S. 727, 734–735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), concluded that, as to the plaintiffs who were Bellwood residents, the injury alleged in *Gladstone, Realtors* was sufficient to satisfy the constitutional requirement of actual or threatened harm. However, it was held that those plaintiffs who were only testers, and who did not live or own a home within the target area of Bellwood, did not have standing to sue under the Fair Housing Act of 1968. In this case, Ms. Sharp falls in this category: she did not live in Bellwood during the period in question, she did not own a home there, she was only a tester of the sales practices of Dwayne. Therefore, she does not have standing to sue in this case. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 112, n.25, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), even though she can be a witness.

The other individual plaintiffs have standing to proceed with this suit.

■ As to the Leadership Council, the Court of Appeals in *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013 (7th Cir. 1978), had before it the same complaint reviewed by the Supreme Court in *Gladstone, Realtors*. After reviewing the same allegations this court now has before it, the Seventh Circuit held that "the Council's interest in open housing matters and its asserted commitment to effectuating that interest, albeit commendable, do not substitute for the concrete injury constitutionally required to invoke the jurisdiction of the federal courts." 569 F.2d 1013 at 1017. Accordingly, this court concludes that Ms. Sharp and the Leadership Council lack standing to sue in this case. An Order will be entered dismissing this suit as to them.[2]

### B. The Issue of Proof

■ Since it is the plaintiffs who allege that defendants "undertook efforts to influence the choice of prospective home buyers on the basis of race and discouraged prospective black homeowners from purchasing homes in white areas . . .", they have the burden of proving these allegations. *Marr v. Rife*, 503 F.2d 735, 739 (6th Cir. 1974); compare *Haythe v. Decker Realty Co.*, 468 F.2d 336 (7th Cir. 1972). They claim, and thus must prove, that during the period in question, in the Village of Bellwood, defendants engaged in racial steering of prospective real estate customers by influencing Caucasians to buy homes outside of the Zuelke Drive area, and influencing Negro homebuyers into making residential purchases only in that area. Racial steering in the sale or rental of real estate is a violation of the Fair Housing Act of 1968. *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978); *United States v.*

---

**2.** At the time this case was tried, this court did not have the guidance of either *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013 (7th Cir. 1978) or of *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66, 1601 (1979). It had accepted the reasoning in *Topic v. Circle Realty*, 532 F.2d 1273 (9th Cir. 1976). Now, having the benefit of these two decisions, this court will retract all statements and remarks made during and after the trial of this case on the subject of plaintiffs' standing. It chooses to be bound only by the discussion of the issue of standing contained in this Memorandum.

*American Institute of Real Estate Appraisers*, 442 F.Supp. 1072, 1079 (N.D.Ill.1977). This kind of racist behavior has been defined as the use of a word, phrase, or act by a real estate broker or salesperson which is intended to influence the choice of a prospective property buyer on a racial basis. *Zuch v. Hussey*, 394 F.Supp. 1028, 1047 (E.D.Mich.1975). It is a form of race discrimination which may be established either by proof of purpose or of effect. *Acevedo v. Nassau County, New York*, 369 F.Supp. 1384, 1387 (E.D.N.Y.1974).

■ Despite this rule, proof by effect is impossible on the facts at bar; the evidence does not show that there was an adverse effect on anyone as the result of what plaintiffs allege was a practice of racial steering by defendants. Therefore, the court must distinguish the showing made here from that in *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977) where it was held that proof of discriminatory effect alone may justify a federal equitable response when a claim of housing discrimination is involved. Indeed, this is always true whenever a racially discriminatory practice in housing is sought to be proved solely by the testimony of testers.

■ Of course, this is not to suggest that a tester is incompetent to testify. It is generally recognized that he or she is a competent witness. See *Zuch v. Hussey*, 394 F.Supp. 1028, 1051 (E.D.Mich.1975); compare *Wharton v. Knefel*, 562 F.2d 550, 554 (8th Cir. 1977). In fact, the court of appeals for this circuit has said, in passing, that "tester evidence itself creates a triable fact issue." *Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013, 1016 (7th Cir. 1978). And at least one court has observed that proof "of the experiences of white and black 'testers' or 'checkers' has been uniformly admitted into evidence to prove the existence of discriminatory policy." *United States v. Youritan Construction Company*, 370 F.Supp. 643, 650 (N.D.Cal.1973). However, in this case, the testers were not disinterested witnesses. They instigated this suit; they tested Dwayne Realty in order to advance economic and noneconomic interests of theirs they thought were at stake; and they were candid in admitting to having strong feelings against real estate brokers in general, and these defendants in particular, because of developing social conditions in their village which they attributed to them.

Generally, the interests of a witness which affect his credibility signify the specific inclination that is apt to be produced by the relation between the witness and the facts at issue in the litigation, and connotes or implies concern for the advantage or disadvantage of the parties to the cause. 98 C.J.S. Witnesses § 538, see *Foster v. United States*, 282 F.2d 222, 224 (10th Cir. 1960). This specific inclination is a natural tendency of human nature. When a person has an interest in the outcome of a case; when he harbors strong feelings against a party, the tendency is for him to shape his sensory reactions so that they fit the testimony he wants to give. See 3 Wigmore, Evidence §§ 940, 945 (Chadbourn rev. 1970). Bearing these psychological factors in mind, this court observed these testers as they gave their testimony. It noticed their demeanor on the stand, considered their avowed interests in the outcome of this case, took into account the inherent probability and consistency of their testimony, and the corroboration, or lack thereof, with other credible evidence, such as documentary exhibits.

While doing this, the court could not overlook the fact that when Mr. Powell testified, he tried hard to make it appear that when he and his wife tested Dwayne Realty, Mrs. Sedivy refused to show them any home in the Zuelke Drive area. Plainly, this was the kind of evidence plaintiffs needed; and if it were true, it would prove racial steering. Mr. Powell also said that Mrs. Sedivy would not show him and his wife a home in a racially integrated area. But as to not being taken into Zuelke Drive, Mr. Powell's testimony was weakened by the fact that he could give no rational explanation for this somewhat bizarre behavior by Mrs. Sedivy. Dwayne salespersons earned their livelihood by selling residential

real estate in Bellwood; they had no personal interest in preserving Zuelke Drive as an all-Negro area. Mrs. Sedivy's denial of Mr. Powell's assertions was straightforward, and made sense. Moreover, Mr. Powell's claim that she expressed the unwillingness to show him a home in an integrated area was refuted by himself when he had to admit that Mrs. Sedivy took him and his wife into at least two integrated areas on the day of the test. Mr. Powell was impeached by the fact that an area of Bellwood he said Mrs. Sedivy reserved for them to consider, because it was not integrated, was in fact a racially integrated neighborhood in the village.

Ms. Sandra J. Sharp presented a different and more difficult problem of credibility. Early in her testimony she disclosed her zealous interest in the task of ferreting out racism among real estate brokers in the six-county metropolitan area of Chicago. No one need tell this court that one of the most pervasive social evils in this country is racism; particularly racism in housing opportunities because it interferes with the right of a citizen to choose a home. Housing segregation that results from racism of this kind has a far-reaching impact in American life. In *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Supreme Court had occasion to acknowledge that "[t]here can be no question about the importance" to an American community of "promoting stable, racially integrated housing." 431 U.S. 85 at 94, 97 S.Ct. 1614 at 1619, 52 L.Ed.2d 155. The court went on to point out that it was for this reason that "Congress has made a strong national commitment to promote integrated housing." *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). Racial segregation in public education is linked to housing segregation. See, e. g. *Lee v. Nyguist*, 318 F.Supp. 710, 717 (W.D.N.Y.1970). Social tranquility of a community is related to housing segregation. See National Advisory Commission on Civil Disorders, Report 237 (1968); 114 Cong.Rec. 2276 (1968). Therefore, Ms. Sharp's interest in making the test of

Dwayne Realty, as well as that of the other testers, was laudable and totally consistent with the objectives of the Fair Housing Act of 1968.

Unfortunately, her testimony did not aid the task in which she was involved when she made the test of Dwayne Realty on September 19, 1975. From what Ms. Sharp described, she and Mr. Cavicchioni had a pleasant conversation about the prospect of her purchasing a home in the multiple listing area. He took the time to discuss with her the comparable advantages of the various communities about which she feigned ignorance. A secretary in the office joined in the conversation to add some common talk about the schools, public and parochial, that were available. Mr. Cavicchioni, according to her, gave Ms. Sharp information about the distances from a plant where she had told him her husband was employed. He compared the values of homes in the various communities and told her he thought she would be happy were she to purchase a home in the Village of Bellwood. He gave her the listings of seven homes: one in Zuelke Drive, one in Broadview and five in Bellwood, outside the Zuelke Drive area. She did not request to visit any of the homes; and Mr. Cavicchioni did not offer to take her on an inspection. Ms. Sharp testified that she told Mr. Cavicchioni she was going to discuss the listings with her husband and let Dwayne Realty know if an inspection was desired.

Two of the homes about which she was told were in the same racially integrated neighborhoods that the Powells, Caucasians, had been taken to by Mrs. Sedivy when they tested Dwayne. Mr. Cavicchioni did not suggest to Ms. Sharp where she should purchase a home in Bellwood; he said nothing nor committed any act, based on race, to influence her in the choice of a home. Ms. Sharp admitted that she had never been to Dwayne Realty before; she had never dealt with Mr. Cavicchioni or anyone else from that real estate brokerage; and her testimony does not suggest she knew anything about the conduct of anyone connected with that real estate office. Yet, at the

close of her direct examination she was asked how Mr. Cavicchioni had treated her. Her answer was, "He treated me as if I had a disease."

Ms. Sharp could not recall a single word uttered by Mr. Cavicchioni, nor could she describe any act by him which justified her characterization of his conduct. It was evident from her demeanor that her purpose was to make it appear that Mr. Cavicchioni was racially prejudiced toward members of the minority races. However, when defendants put on their case, they called two Negroes and one Asian who testified about their dealings with Dwayne Realty, and particularly with Mr. Cavicchioni. This court noticed that when the non-Caucasians described their relationship with Mr. Cavicchioni, they spoke in terms which revealed that in all their dealings with him, Mr. Cavicchioni not only treated them with courtesy and respect, but also dealt with them as equals. One of the attributes of a racist is that he never deals with the objects of his invidiousness as equals. He may be friendly with some of them; indeed he may even be intimate with a member of the other race; but he never treats such persons on terms of equality. Contrasting the testimony of the witnesses called by the defendants with that of Ms. Sharp, this court had to conclude that she was a biased and prejudiced witness who injected into her testimony an unfounded insinuation. Bias or prejudice in a witness is always relevant, and the general rule, both in civil and criminal cases is that a witness may be discredited by showing his bias or prejudice on cross examination or by other witnesses or evidence. *Ellis v. Capps*, 500 F.2d 225 (5th Cir. 1974; 81 Am.Jur.2d Witnesses § 547. For this reason, the court, regrettably, felt compelled to decide that Ms. Sharp had discredited herself as a witness, and that none of her testimony should be considered in resolving the issues in this case.

As to Mr. Charles Elliott, his testimony disclosed that before he made the test on September 28, 1975, he attended the same briefing meeting at the Leadership Council where the other testers, Mr. Powell, Ms. Sharp, and Mrs. Perry had agreed to the role-playing they were going to engage in at Dwayne Realty. Therefore, Mr. Elliott knew that he, a Caucasian, had to be able to testify that a Dwayne salesperson steered him away from the Zuelke Drive area when he expressed an interest in purchasing a home. From his demeanor on the stand, it was evident that he was testifying that Mrs. Kloth, who served him and his "wife" took from his hand the listing of 227 Zuelke Drive so he would not look at a home in an integrated area. It was because of this that Mr. Elliott insisted he did not believe Mrs. Kloth when she told him the home was sold. But defendants were able to prove, beyond question, that Mrs. Kloth was telling the truth; the home in question had been sold. Moreover, Mr. Elliott admitted that among the listings he was given, and like Mrs. Perry not shown, was a home in a nonintegrated area of Bellwood which, later that day, was also given by Mrs. Sedivy to the other tester, Mrs. Perry, a Negro woman. Another property in Broadview, one that had been shown to the Powells, was also given to Mr. Elliott and his "wife"; the same property Mrs. Perry was also told about the same day by Mrs. Sedivy. It is obvious, then, that the test of Dwayne made by Mr. Elliott, and about which he testified, did not support plaintiffs' theory that defendants were engaged in racial steering.

Finally, Mrs. Joyce Perry, the last tester of Dwayne. She testified that as the realty office was closing on September 28, she arrived and was served by Mrs. Sedivy who remembered the event, particularly what Mrs. Perry was wearing. Apparently, the attire of one woman is something another never forgets. Mrs. Sedivy said that Mrs. Perry "had a floppy hat that was cute, a pair of bluejeans and she looked like a young little girl." Mrs. Perry told Mrs. Sedivy that she and her husband were being transferred from Cleveland, Ohio to the Chicago area, and that she wanted a home near the Xerox Corporation in Oak Brook. The two women sat down and looked through the listing book. Mrs. Perry admitted she did not ask to be shown any homes; and that she told Mrs. Sedivy of wanting to discuss the listings with her

husband. She·was given a large number of listings, at least nine. One of these was a home in an integrated area in Bellwood that had been shown to the Powells on September 15, 1975, during that test of Dwayne. Another was the same home in Broadview which had been shown to the Powells by Mrs. Sedivy, and given to the Elliotts by Mrs. Kloth earlier that day. A home on Cernan in Bellwood about which Mrs. Perry was told, was in the same block as the home to which the Powells were taken during the first test of Dwayne Realty. Mrs. Perry was not told anything by Mrs. Sedivy, nor did Mrs. Sedivy commit any act which if said or done to a purchaser of a home could be construed as racial steering. Mrs. Perry did not ask to be shown any home; Mrs. Sedivy did not offer to do so. In her testimony, Mrs. Sedivy explained that Mrs. Perry assured her she wanted to take the listings to her husband, discuss them with him and then inform Dwayne Realty of their decision to see a particular home.

Defendants met all of plaintiffs' evidence with their testimony, and that of five witnesses who had no avowed interest in this dispute. Two were Negroes, two were Caucasians, one was an Asian for whom Dwayne Realty had obtained residential property in two southwestern communities of Cook County, and who had been shown homes in Westchester, a community the parties agree was considered at the time of this dispute nonintegrated. From Dwayne's records showing completed sales during the period involved in this dispute, October 1, 1974 to October 31, 1975, defendants were able to show that salespersons from Dwayne had shown and supervised closings of residential real estate transactions in the Village of Bellwood to members of the Negro race, all of them outside the Zuelke Drive area. And effectively impeaching the testimony of Mrs. Montana, defendants were able to establish, without contradiction, that Dwayne has never discouraged anyone or sought to influence any prospective purchaser of residential real estate from buying a home in the Village of Bellwood. In one instance shown by the evidence, defendants proved that Mr. Cavic-

chioni, after handling a contract signed by Mr. Printes Gordon Bell and his wife, urged the filing of a lawsuit in order to enforce the contract when he began to believe race was the reason why the seller had refused to go through with the transaction. Mr. Cavicchioni later authorized the payment of $350.00 to Mr. Bell who came to him saying that the necessary litigation had placed on him a financial burden in connection with which he needed assistance.

██ But in this court's judgment, the telling evidence that disposes of this dispute is the testimony of Mr. Robert C. Appleby, Jr. a Caucasian who testified for defendants. He said that in April, 1975 he went to Dwayne Realty looking for a home for his family. Mrs. Kloth served him, and after showing him listings in Westchester, Berkeley, Broadview, Hillside and Maywood, the last community one that is considered to be largely occupied by members of the Negro race, she took him to one in Bellwood. When they arrived he noticed that a Negro child was playing in the yard next door. He was asked whether Mrs. Kloth had mentioned anything about the racial composition of the neighborhood. Mr. Appleby said that the subject was not discussed. He was asked whether he had any objection to purchasing the home. He said he did not. That was the home in which Mr. Appleby and his family were living at the time of his testimony.

When he was cross examined, Mr. Appleby was asked the name of the Negro couple that lived next door to him. Without hesitation, he gave their first and last names. Then he was asked the name of the Negro boy he saw playing in the yard when he first visited the neighborhood. He was able to answer the question. He was asked how many children the Negro couple had. He said three, then he gave their names, and ages of two of them.

From Mr. Appleby's testimony, this court was able to see that not only did a Dwayne salesperson show him a home in a racially integrated neighborhood of Bellwood, outside the Zuelke Drive area; he purchased a home next to one owned by a Negro couple

with whom he and his family were on good social terms. Mr. Appleby's testimony effectively destroyed the entire claim of the plaintiffs in this case; the evidence he gave, and the others in this record, prove that during the period in question defendants did not engage in the practice of racial steering of real estate customers in the Village of Bellwood. Accordingly, judgment will be entered in favor of each defendant and against the remaining plaintiffs, Village of Bellwood, Edward Powell, Charles Elliott, Vicki Simmons, Mary P. Powell, and Joyce Perry. The clerk of this court will be ordered to enter a judgment that will comply with Rule 58(1), Federal Rules of Civil Procedure.