# LINMARK ASSOCIATES, INC., ET AL. *v.* TOWNSHIP OF WILLINGBORO ET AL.

No. 76–357.   Argued March 2, 1977—Decided May 2, 1977

*John P. Hauch, Jr.,* argued the cause for petitioners.   With him on the brief was *Thomas L. Earp.*

*Myron H. Gottlieb* argued the cause and filed a brief for respondents.*

Mr. Justice Marshall delivered the opinion of the Court.

This case presents the question whether the First Amendment permits a municipality to prohibit the posting of "For Sale" or "Sold" signs when the municipality acts to stem what it perceives as the flight of white homeowners from a racially integrated community.

Petitioner Linmark Associates, a New Jersey corporation, owned a piece of realty in the township of Willingboro, N. J. Petitioner decided to sell its property, and on March 26, 1974, listed it with petitioner Mellman, a real estate agent. To attract interest in the property, petitioners desired to place a "For Sale" sign on the lawn. Willingboro, however, narrowly limits the types of signs that can be erected on land in the township. Although prior to March 1974 "For Sale" and "Sold" signs were permitted subject to certain restrictions not at issue here, on March 18, 1974, the Township Council enacted Ordinance 5–1974, repealing the statutory authorization for such signs on all but model homes. Petitioners brought this action against both the township and the building inspector charged with enforcing the ban on "For Sale" signs, seeking declaratory and injunctive relief.[1] The District

---

*Joel M. Gora* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Jack Greenberg, Charles Stephen Ralston,* and *Melvyn R. Leventhal* for the N. A. A. C. P. Legal Defense & Educational Fund, Inc.; by *Paul R. Donaldson* and *Donald K. Barclay* for the cities of Shaker Heights and Cleveland Heights, Ohio; by *Burton R. Shifman* for the city of Oak Park, Mich.; and by Housing Advocates, Inc.

[1] Respondents report that according to a deed on file in Burlington County, N. J., petitioner Linmark Associates' property was sold on April 21, 1976, while this case was pending in the Court of Appeals. Brief for Respondents 8 n. 2. This does not moot this case, however, since at

Court granted a declaration of unconstitutionality, but a divided Court of Appeals reversed, 535 F. 2d 786 (CA3 1976). We granted certiorari, 429 U. S. 938 (1976), and reverse the judgment of the Court of Appeals.

## I

The township of Willingboro is a residential community located in southern New Jersey near Fort Dix, McGuire Air Force Base, and offices of several national corporations. The township was developed as a middle-income community by Levitt & Sons, beginning in the late 1950's. It is served by over 80 real estate agents.

During the 1960's Willingboro underwent rapid growth. The white population increased by almost 350%, and the nonwhite population rose from 60 to over 5,000, or from .005% of the population to 11.7%. As of the 1970 census, almost 44,000 people resided in Willingboro. In the 1970's, however, the population growth slowed; from 1970 to 1973, the latest year for which figures were available at the time of trial, Willingboro's population rose by only 3%. More significantly, the white population actually declined by almost 2,000 in this interval, a drop of over 5%, while the nonwhite population grew by more than 3,000, an increase of approximately 60%. By 1973, nonwhites constituted 18.2% of the township's population.

At the trial in this case respondents presented testimony from two real estate agents, two members of the Township Council, and three members of the Human Relations Commission, all of whom agreed that a major cause in the decline in

___

least as to petitioner Mellman, the real estate agent, there plainly is an "immediate prospect," *Steffel* v. *Thompson,* 415 U. S. 452, 459–460 (1974), that he will desire to place "For Sale" signs on other property in Willingboro, and thus there remains a controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941).

the white population was "panic selling"—that is, selling by whites who feared that the township was becoming all black, and that property values would decline. One real estate agent estimated that the reason 80% of the sellers gave for their decision to sell was that "the whole town was for sale, and they didn't want to be caught in any bind." App. in No. 75–1448 (CA3), pp. 219a–220a. Respondents' witnesses also testified that in their view "For Sale" and "Sold" signs were a major catalyst of these fears.

William Kearns, the Mayor of Willingboro during the year preceding enactment of the ordinance and a member of the Council when the ordinance was enacted, testified concerning the events leading up to its passage. *Id.*, at 183a–186a. According to Kearns, beginning at least in 1973 the community became concerned about the changing population. At a town meeting in February 1973, called to discuss "Willingboro, to sell or not to sell," a member of the community suggested that real estate signs be banned. The suggestion received the overwhelming support of those attending the meeting. Kearns brought the proposal to the Township Council, which requested the Township Solicitor to study it. The Council also contacted National Neighbors, a nationwide organization promoting integrated housing, and obtained the names of other communities that had prohibited "For Sale" signs. After obtaining a favorable report from Shaker Heights, Ohio, on its ordinance, and after receiving an endorsement of the proposed ban from the Willingboro Human Relations Commission, the Council began drafting legislation.

Rather than following its usual procedure of conducting a public hearing only after the proposed law had received preliminary Council approval, the Council scheduled two public meetings on Ordinance 5–1974. The first took place in February 1974, before the initial Council vote, and the second in March 1974, after the vote. At the conclusion of the second hearing, the ordinance was approved unanimously.

The transcripts of the Council hearings were introduced into evidence at trial. They reveal that at the hearings the Council received important information bearing on the need for and likely impact of the ordinance. With respect to the justification for the ordinance, the Council was told (a) that a study of Willingboro home sales in 1973 revealed that the turnover rate was roughly 11%, App. in No. 75–1448 (CA3), p. 89a; [2] (b) that in February 1974—a typical month—230 "For Sale" signs were posted among the 11,000 houses in the community, *id.*, at 94a, 37a; [3] and (c) that the Willingboro Tax Assessor had reported that "by and large the increased value of Willingboro properties was way ahead of . . . comparable communities." *Id.*, at 106a. With respect to the projected effect of the ordinance, several real estate agents reported that 30%–35% of their purchaser-clients came to them because they had seen one of the agent's "For Sale" or "Sold" signs, *id.*, at 33a, 47a, 49a, 57a,[4] and one agent estimated, based on his experience in a neighboring community that had already banned signs, that selling realty without signs takes twice as long as selling with signs, *id.*, at 42a.

The transcripts of the Council hearings also reveal that the hearings provided useful barometers of public sentiment toward the proposed ordinance. The Council was told, for

---

[2] At the beginning of the first hearing, the then Mayor estimated that 1,100 houses are sold each year, a 10% turnover rate. App. in No. 75–1488 (CA3), p. 37a.

[3] Another real estate agent reported that on January 7, 1974, in the Twin Hills section of Willingboro, 32 signs were posted among the 920 houses. He further stated that during the preceding year, the highest number of signs in Twin Hills at any one time was 62. *Id.*, at 77a–78a.

At trial, one of respondents' real-estate-agent witnesses testified that he had surveyed the number of signs in August 1973 and found more than 230; he did not recall, however, how many signs were standing at that time. *Id.*, at 225a.

[4] At trial, petitioner Mellman corroborated this figure based on his own business. *Id.*, at 135a.

example, that surveys in two areas of the township found overwhelming support for the law, *id.*, at 29a, 84a.[5] In addition, at least at the second meeting, the citizens, who were not real estate agents and who spoke, favored the proposed ordinance by a sizable margin. Interestingly, however, at both meetings those defending the ordinance focused primarily on aesthetic considerations and on the effect of signs—and transiency generally—on property values. Few speakers directly referred to the changing racial composition of Willingboro in supporting the proposed law.

Although the ordinance had been in effect for nine months prior to trial, no statistical data were presented concerning its impact. Respondents' witnesses all agreed, however, that the number of persons selling or considering selling their houses because of racial fears had declined sharply. But several of these witnesses also testified that the number of sales in Willingboro had not declined since the ordinance was enacted. Moreover, respondents' real-estate-agent witnesses both stated that their business had increased by 25% since the ordinance was enacted, *id.*, at 164a, 226a, and one of these agents reported that the racial composition of his clientele remained unchanged, *id.*, at 160a.

The District Court did not make specific findings of fact. In the course of its opinion, however, the court stated that Willingboro "is to a large extent a transient community, partly due to its proximity to the military facility at Fort Dix and in part due to the numerous transfers of real estate." The court also stated that there was "no evidence" that whites were leaving Willingboro en masse as "For Sale" signs appeared, but "merely an indication that its residents are concerned that there may be a large influx of minority groups moving in to the town with the resultant effect being a reduc-

---

[5] One of the two "surveys" took the form of an effort by citizens in the Rittenhouse Park section of Willingboro to ban "For Sale" signs. That effort attracted the support of 70% of the homeowners in the section.

tion in property values." The Court of Appeals essentially accepted these "findings," although it found that Willingboro was experiencing "incipient" panic selling, 535 F. 2d, at 799, and that a "fear psychology [had] developed," *id.,* at 790.

## II

### A

The starting point for analysis of petitioners' First Amendment claim must be the two recent decisions in which this Court has eroded the "commercial speech" exception to the First Amendment. In *Bigelow* v. *Virginia,* 421 U. S. 809 (1975), decided less than two years ago, this Court for the first time expressed its dissatisfaction with the then-prevalent approach of resolving a class of First Amendment claims simply by categorizing the speech as "commercial." *Id.,* at 826. "Regardless of the particular label," we stated, "a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Ibid.* After conducting such an analysis in *Bigelow* we concluded that Virginia could not constitutionally punish the publisher of a newspaper for printing an abortion referral agency's paid advertisement which not only promoted the agency's services but also contained information about the availability of abortions.

One year later, in *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976), we went further. Conceding that "[s]ome fragment of hope for the continuing validity of a 'commercial speech' exception arguably might have persisted because of the subject matter of the advertisement in *Bigelow,*" *id.,* at 760, we held quite simply, that commercial speech is not "wholly outside the protection of the First Amendment," *id.,* at 761. Although recognizing that "[s]ome forms of commercial speech regulations"—such as regulation of false or misleading speech—"are surely per-

missible," *id.*, at 770, we had little difficulty in finding that Virginia's ban on the advertising of prescription drug prices by pharmacists was unconstitutional.[6]

Respondents contend, as they must, that the "For Sale" signs banned in Willingboro are constitutionally distinguishable from the abortion and drug advertisements we have previously considered. It is to the distinctions respondents advance that we now turn.

## B

If the Willingboro law is to be treated differently from those invalidated in *Bigelow* and *Virginia Pharmacy Bd.*, it cannot be because the speakers—or listeners—have a lesser First Amendment interest in the subject matter of the speech that is regulated here. Persons desiring to sell their homes are just as interested in communicating that fact as are sellers of other goods and services. Similarly, would-be purchasers of realty are no less interested in receiving information about available property than are purchasers of other commodities in receiving like information about those commodities. And the societal interest in "the free flow of commercial information," *Virginia Pharmacy Bd.*, *supra*, at 764, is in no way lessened by the fact that the subject of the commercial information here is realty rather than abortions or drugs.

---

[6] The Court of Appeals did not have the benefit of *Virginia Pharmacy Bd.* when it issued its decision in this case. To some extent the court anticipated that decision, recognizing that the fact that "a communication is commercial in nature does not *ipso facto* strip the communication of its First Amendment protections." 535 F. 2d 786, 795 (CA3 1976). But the court premised its analysis on a sharp dichotomy between commercial and "pure" or noncommercial speech, *id.*, at 794, and concluded that commercial speech may be restricted if its "impact be found detrimental" by a municipality, and if "the limitation on any pure speech element [is] minimal," *id.*, at 795. After *Virginia Pharmacy Bd.* it is clear that commercial speech cannot be banned because of an unsubstantiated belief that its impact is "detrimental."

Respondents nevertheless argue that First Amendment concerns are less directly implicated by Willingboro's ordinance because it restricts only one method of communication. This distinction is not without significance to First Amendment analysis, since laws regulating the time, place, or manner of speech stand on a different footing from laws prohibiting speech altogether. Cf., e. g., *Kovacs* v. *Cooper,* 336 U. S. 77 (1949); *Adderley* v. *Florida,* 385 U. S. 39 (1966); *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972). Respondents' effort to defend the ordinance on this ground is unpersuasive, however, for two reasons.

First, serious questions exist as to whether the ordinance "leave[s] open ample alternative channels for communication," *Virginia Pharmacy Bd., supra,* at 771. Although in theory sellers remain free to employ a number of different alternatives, in practice realty is not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated—primarily newspaper advertising and listing with real estate agents—involve more cost and less autonomy than "For Sale" signs; cf. *Martin* v. *City of Struthers,* 319 U. S. 141, 146 (1943); *Kovacs* v. *Cooper, supra,* at 102–103 (Black, J., dissenting); are less likely to reach persons not deliberately seeking sales information, cf. *United States* v. *O'Brien,* 391 U. S. 367, 388–389 (1968) (Harlan, J., concurring); and may be less effective media for communicating the message that is conveyed by a "For Sale" sign in front of the house to be sold, cf. *Cohen* v. *California,* 403 U. S. 15, 25–26 (1971). The alternatives, then, are far from satisfactory.

Second, the Willingboro ordinance is not genuinely concerned with the place of the speech—front lawns—or the manner of the speech—signs. The township has not prohibited all lawn signs—or all lawn signs of a particular size or shape—in order to promote aesthetic values or any other value "unrelated to the suppression of free expression," *United*

*States* v. *O'Brien, supra,* at 377.[7]   Nor has it acted to restrict a mode of communication that "intrudes on the privacy of the home, . . . makes it impractical for the unwilling viewer or auditor to avoid exposure," *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975), or otherwise reaches a group the township has a right to protect.[8]   And respondents have not demonstrated that the place or manner of the speech produces a detrimental "secondary effect" on society, *Young* v. *American Mini Theatres,* 427 U. S. 50, 71 n. 34 (1976).   Rather, Willingboro has proscribed particular types of signs based on their content because it fears their "primary" effect—that they will cause those receiving the information to act upon it.   That the proscription applies only to one mode of communication, therefore, does not transform this into a "time, place, or manner" case.   See, *e. g., Erznoznik* v. *City of Jacksonville, supra; Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 510 (1969). If the ordinance is to be sustained, it must be on the basis of the township's interest in regulating the content of the communication, and not on any interest in regulating the form.

C

Respondents do seek to distinguish *Bigelow* and *Virginia Pharmacy Bd.* by relying on the vital goal this ordinance serves: namely, promoting stable, racially integrated housing. There can be no question about the importance of achieving this goal.   This Court has expressly recognized that substantial benefits flow to both whites and blacks from interracial

[7] Accordingly, we do not decide whether a ban on signs or a limitation on the number of signs could survive constitutional scrutiny if it were unrelated to the suppression of free expression.   See *Baldwin* v. *Redwood City,* 540 F. 2d 1360, 1368–1369 (CA9 1976); cf. *Markham Advertising Co.* v. *State,* 73 Wash. 2d 405, 439 P. 2d 248 (1968), appeal dismissed, 393 U. S. 316 (1969).

[8] Cf. *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582, 585–586 (DC 1971), summarily aff'd, 405 U. S. 1000 (1972).

association and that Congress has made a strong national commitment to promote integrated housing. *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205 (1972).

That this ordinance was enacted to achieve an important governmental objective, however, does not distinguish the case from *Virginia Pharmacy Bd.* In that case the State argued that its prohibition on prescription drug price advertising furthered the health and safety of state residents by preventing low cost, low quality pharmacists from driving reputable pharmacists out of business. We expressly recognized the "strong interest" of a State in maintaining "professionalism on the part of licensed pharmacists." 425 U. S., at 766. But we nevertheless found the Virginia law unconstitutional because we were unpersuaded that the law was necessary to achieve this objective, and were convinced that in any event, the First Amendment disabled the State from achieving its goal by restricting the free flow of truthful information. For the same reasons we conclude that the Willingboro ordinance at issue here is also constitutionally infirm.

The record here demonstrates that respondents failed to establish that this ordinance is needed to assure that Willingboro remains an integrated community.[9] As the District Court concluded, the evidence does not support the Council's apparent fears that Willingboro was experiencing a substantial incidence of panic selling by white homeowners. *A fortiori,* the evidence does not establish that "For Sale" signs in front of 2% of Willingboro homes were a major cause of panic selling. And the record does not confirm the town-

---

[9] As the District Court itself observed, its finding concerning the lack of panic selling distinguishes this case from *Barrick Realty, Inc.* v. *City of Gary,* 491 F. 2d 161 (CA7 1974), in which Gary, Indiana's, prohibition on "For Sale" signs was upheld on a record indicating that such signs were causing "whites to move *en masse* and blacks to replace them." *Id.,* at 163–164. We express no view as to whether *Barrick Realty* can survive *Bigelow* and *Virginia Pharmacy Bd.*

ship's assumption that proscribing such signs will reduce public awareness of realty sales and thereby decrease public concern over selling.[10]

The constitutional defect in this ordinance, however, is far more basic. The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Bd.*, acted to prevent its residents from obtaining certain information. That information, which pertains to sales activity in Willingboro, is of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have a right to make: where to live and raise their families. The Council has sought to restrict the free flow of these data because it fears that otherwise homeowners will make decisions inimical to what the Council views as the homeowners' self-interest and the corporate interest of the township: they will choose to leave town. The Council's concern, then, was not with any commercial aspect of "For Sale" signs—with offerors communicating offers to offerees—but with the substance of the information communicated to Willingboro citizens. If dissemination of this information can be restricted, then every locality in the country can suppress any facts that reflect poorly on the locality, so long as a plausible claim can be made that disclosure would cause the recipients of the information to act "irrationally." *Virginia Pharmacy Bd.* denies government such sweeping

---

[10] While this assumption is certainly plausible, it is also possible that eliminating signs will cause homeowners to turn to other sources for information, so that their awareness of—and concern over—selling will be unaffected. Indeed, banning signs actually may fuel public anxiety over sales activity by increasing homeowners' dependence on rumor and surmise. See Laska & Hewitt, Are Laws Against "For Sale" Signs Constitutional? Substantive Due Process Revisited, 4 Real Estate L. J. 153, 160–162 (1975) (reporting on a study finding such an adverse effect from a ban on "For Sale" signs).

The fact that sales volume remained unchanged in Willingboro in the first nine months after the ordinance was enacted suggests that it did not affect public concern over selling, if that concern was a significant cause of housing turnover.

powers. As we said there in rejecting Virginia's claim that the only way it could enable its citizens to find their self-interest was to deny them information that is neither false nor misleading:

> "There is . . . an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. . . . But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." 425 U. S., at 770.

Or as Mr. Justice Brandeis put it: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." *Whitney* v. *California,* 274 U. S. 357, 377 (1927) (concurring opinion).

Since we can find no meaningful distinction between Ordinance 5–1974 and the statute overturned in *Virginia Pharmacy Bd.,* we must conclude that this ordinance violates the First Amendment.

### III

In invalidating this law, we by no means leave Willingboro defenseless in its effort to promote integrated housing. The township obviously remains free to continue "the process of education" it has already begun. It can give widespread publicity—through "Not for Sale" signs or other methods—to the number of whites remaining in Willingboro. And it surely can endeavor to create inducements to retain individuals who are considering selling their homes.

Beyond this, we reaffirm our statement in *Virginia Pharmacy Bd.* that the "commonsense differences between speech that does 'no more than propose a commercial transaction,' *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. [376,] 385 [(1973)], and other varieties . . . suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." 425 U. S., at 771–772, n. 24. Laws dealing with false or misleading signs, and laws requiring such signs to "appear in such a form, or include such additional information . . . as [is] necessary to prevent [their] being deceptive," *ibid.,* therefore, would raise very different constitutional questions. We leave those questions for another day, and simply hold that the ordinance under review here, which impairs "the flow of truthful and legitimate commercial information" is constitutionally infirm.

*Reversed.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.