**CLEVELAND AREA BOARD OF REALTORS, et al., Plaintiffs,**

v.

**The CITY OF EUCLID, OHIO, Defendant.**

No. 1:92CV2714.

United States District Court, N.D. Ohio, E.D.

Sept. 29, 1993.

noncommercial signs on residential property. CABOR claims that the Euclid ordinances violate the United States and Ohio Constitutions, denying freedom of speech, due process, and equal protection, and seeks injunctive relief to prevent the enforcement of the ordinances.

For the reasons stated below, this Court finds that Euclid Ordinance Nos. 246–1992, 5–1993 and 80–1993 violate the first amendment of the United States Constitution. Therefore, this Court permanently enjoins the enforcement of these ordinances, and enters final judgment in CABOR's favor.[1]

## I

Beginning on May 4, 1993, this Court conducted a ten day bench trial. This Court has considered the pleadings, evidence, and arguments of counsel, and pursuant to Fed. R.Civ.P. 52, makes the following findings of fact and conclusions of law. Any finding may be deemed a conclusion, and any conclusion may be deemed a finding.

**FINDINGS OF FACT**

Arthur M. Kaufman, Robert J. Fogarty, Hahn, Loeser & Parks, Cleveland, OH, for plaintiffs.

R. Todd Hunt, Walter, Haverfield, Buescher & Chockley, Cleveland, OH, Richard Anthony Wiegand, City of Euclid, Dept. of Law, Euclid, OH, for defendant.

*MEMORANDUM AND ORDER*

ANN ALDRICH, District Judge.

The Cleveland Area Board of Realtors ("CABOR"), Acacia Realty Professionals, Inc., Mary Jane Balazs, Brickman & Associates Realty, Inc., Century 21 Leo Baur Realtors, HRI, Inc. d/b/a Hilltop Realty, Frank J. Jochum d/b/a Frank J. Jochum Realty, and John Miller (collectively "CABOR") bring this action against the City of Euclid, Ohio ("Euclid"), challenging the constitutionality of three Euclid ordinances (Nos. 246–1992, 5–1993 and 80–1993) which regulate the size, number and placement of commercial and

## II

Euclid has a population of approximately 55,000, and is located in Cuyahoga County, to the east and adjacent to the City of Cleveland, Ohio. (Plaintiffs' exh. 20). Euclid covers an area of 10.3 square miles, is traversed by Interstate 90 and a series of railroad tracks, and contains a mix of residential, commercial and industrial areas. *Id.* The housing stock in Euclid is comprised of many entry-level homes including half-duplexes, small bungalows, ranch-style homes, and colonials. (Tr. 96). The half-duplexes generally sell between $30,000 and $40,000, and the other types of homes are priced in the $50,000 to $150,000 range. *Id.* The average set back for homes in Euclid is 30–50 feet from the public right of way, and the average lot size is 40 feet by 120–140 feet (Tr. 493, 542, 734, 1060). At any given time, there are approximately 200 active real estate listings in Euclid. (Tr. 161). This means that there are real estate lawn signs on roughly 1.2 percent of the 16,000 housing units in Euclid

1. This Court declines to address CABOR's other federal and state constitutional claims.

at any one time. *Id.* The Euclid industrial base consists of 150 manufacturing plants, which produce machines, airplanes, helicopters, automotive parts, welding equipment, and small machine shop specialties. (Plaintiffs' exh. 20).

In late 1991, the Euclid Indian Hills neighborhood association held a meeting that was attended by a city official. (Tr. 861). At the meeting, residents complained that realtors were putting up too many signs in their neighborhood. (Tr. 870). After the meeting, realtors contacted the Mayor's office, and requested a series of meetings to discuss the issues raised at the Indian Hills meeting. (Tr. 862). Euclid officials met with realtors on a number of occasions, and Mayor David Lynch asked Euclid Community Service Director Kory Koran to draft a "Real Estate Action Plan" to address the issues that had been considered. *Id.*

The December 3, 1991 draft of the Real Estate Action Plan from Koran to Lynch noted that:

> Sign concentration and marketing techniques called "farming" upends traditional neighborhoods with strong homeownership by creating an air of rapid change. This scares people into panic selling with the result of undermining the current sales market.

> The real estate industry has complained of unfair accusations leveled at them by the public and neighborhood associations.

(Plaintiffs' Exh. 10, at 1). The final version of the Real Estate Action Plan, dated December 4, 1991, omitted these two paragraphs, but stated: "Sign ordinance legislation should be discussed. This may create a much needed 'quieting' of the Euclid housing market." (Plaintiffs' Exh. 11, at 1–2).

At trial, Koran testified that the use of the word "quieting" in the Real Estate Action Plan referred to Euclid's desire to quiet resident complaints, and not the housing market. (Tr. 870). This Court finds that Koran's testimony was not credible, given the reference to the "Euclid housing market" in the action plan, and Euclid's evident concern about panic selling and the stability of the local housing market.

Prior to the passage of Ordinance No. 246–1992, Euclid's Building and Housing Code (§ 1743.32(a)(1)) provided that real estate signs advertising the sale, rental, lease or management of residential properties were permitted anywhere on the premises, but were limited in size to five square feet.

On September 21, 1992, Euclid City Councilmembers William Cervenik, Joseph Dallos, Edmund Gudenas, and Demetra Fay Miller introduced Ordinance No. 246–1992, which mandated that real estate signs be placed in the windows of structures located in residential areas. In addition, 246–1992 restricted the size of real estate signs to no greater than three square feet if located within seventy-five feet from the front public right of way, and to no greater than four square feet if located more than seventy-five feet from the front public right of way. However, residents were permitted to apply for a variance to place the sign elsewhere on the lot, or to request a larger sign, if the view of the window sign was obstructed. The effective date of proposed ordinance 246–1992 was January 1, 1993.

At the September 28, 1992 meeting of the Euclid City Council, Cervenik stated:

> During the past summer, in fact before this past summer, myself as well as many of my constituents have noticed a large increase in the number of for sale signs and realty signs throughout the city, with certain neighborhoods and streets standing out in particular.... My contention is that these signs are basically an eyesore in our neighborhood. We have a unique constituency in the City of Euclid that most people go out of their way to make sure their homes and yards are immaculate and you notice as you go down the street. However, it's starting to be destroyed by the number of lawn signs you have.

> \*    \*    \*    \*    \*    \*

> My contention is that cities with neighborhoods with signs like that, not good, not pretty, shouldn't be allowed.... From the supply and demand, I don't think it does anyone or the house values any good at all to have streets such as Priday, 213th, Newton, 256th, to have 15 signs on them.

It does nothing for the home values, nothing for the people trying to sell, nothing for the people who want to move into this community. It's very bad economically. Furthermore, we have one more. That is the perception of the neighborhood. *We have a neighborhood with 10 or 15 signs, the questions are, "Why is everybody moving out?" "What is wrong with this neighborhood?" "Is this not a good city to live in?" "Do they not provide the services we need?" "Is the school system below par, is that why all the people are moving out?" These are the questions that arise. I will tell you right now, it doesn't matter what the real reasons are. It doesn't matter that every single person on Friday had an unexpected transfer out of town, if ten signs on the street raise questions of our school system, neighborhoods and services, then the perception eventually becomes reality and we're all going to pay the price in house values and strong neighborhoods.*

(Plaintiffs' exh. 6, at 1–2) (emphasis added).

At the same meeting, Koran commented:

There's three reasons why we should all support this ordinance.... The first is aesthetics. I agree that putting commercial signs in a residential district is not good for a neighborhood.... The second is economics. We have found through our research South Euclid, Cleveland Heights, and Shaker Heights which have real estate ordinances, that their housing values have increased over inflation moreso than other communities do [sic], especially Euclid. We found those three communities, that the housing values are increasing more than Euclid. Other things could be impacting the inflation of homes, so we feel real estate signs may be one reason why our housing values have not kept up with inflation. The third is the perception of the neighborhood. A single family home is an average person's largest investment in their lifetime. When you buy a home it's something you consider, you stay up nights thinking about this investment. If you are looking for a home, drive down the street and see eight real estate signs on a street with sixteen homes on it, the first thing you think of is there's a problem here,

whether it's services, schools or whatever. You really don't care what the problem is, but you're going to look on another street that does not have one out of two homes for sale. I feel that's the important issue, the perception of the neighborhood, when you drive down the street and see sign after sign, after sign, you're not going to buy a home on that street.

(Plaintiffs' exh. 6, at 5)

In October, 1992, Euclid commissioned the Cuyahoga County Planning Commission ("CCPC") to conduct a random telephone survey of 200 Euclid residents to explore their opinions and attitudes concerning the regulation of real estate signs. (Plaintiffs' exh. 8). In response to a question that asked, "What effect do you think real estate signs on front lawns have on your neighborhood?", the survey found that 105 (52.5%) residents said real estate signs had no effect on the neighborhood, 62 (30.8%) said real estate signs had a negative effect, and 33 (16.7%) said there was a positive effect. *Id.* at 2. The CCPC report concluded:

In general, the real estate sign survey indicated that the 200 respondents were not concerned about the existence of real estate signs in their neighborhood. They also showed that the majority were against the complete banning of these signs in the front yards. Specifically, homeowners that responded followed the overall consensus that these signs should not be regulated.... The majority of those surveyed within this cross-section of Euclid residents, indicated that the fear of real estate signs does not exist.

*Id.* at 3.

Councilman Dallos conducted door-to-door surveys in Ward 4 on two occasions. In 1989, in response to a question that asked whether Euclid should ban all real estate and political signs in the front yards, 732 (46%) said "yes"; 574 (36%) said "no"; and 277 (18%) had no opinion. (Defendant's exh. II–K; exh. I–P, at 19). However, in 1991, in response to a question that asked whether Euclid should ban real estate signs in the front yards, 578 (42%) said "yes"; 645 (47%) said "no"; and 146 (11%) had no opinion. *Id.*

The results of Dallos' 1991 survey were consistent with the CCPC survey results.[2]

On October 22, 1992, Paul Oyaski, Euclid's Director of Law, sent a letter to Patricia Carey, Government Affairs Director for CABOR, requesting CABOR to respond to a number of questions related to "yard sign issues." (Plaintiffs' exh. 62). One question stated:

(8) Can CABOR document that it is showing homes in all areas of the City to persons of all races considering only income of prospective home buyers?

Can CABOR document that, for example, white homebuyers are being shown homes within their income range in the Babbitt Road neighborhood mentioned above?

*Id.* at 2. None of the questions in the October 22nd letter discussed or mentioned the issue of aesthetics. (*Id.;* Tr. 227).

Oyaski also asked Charles Braman, a real estate appraiser, to comment on the effect of a sign ordinance upon the marketing of real estate and property values in Euclid. (Tr. 995). In a letter dated October 21, 1992, Braman wrote:

Property values are adversely affected in a neighborhood where there is a proliferation of for sale signs. In this circumstance there is a perception on the part of potential buyers that there is an imbalance between the supply of properties available in an area and the demand for properties in that area. As in all cases where there is an imbalance ..., prices tend to fall so prospective purchasers aware of this principal are looking for bargains. This results in a disadvantage to the property.

(Plaintiffs' Exh. 27, at 1). At trial, however, Braman stated:

There are so many more things that are more important than a sign that has to do with the sale prices of a property that if you are doing a multiple regression equation and putting things in like size of house, size of lot, condition, baths, fireplaces, signs would be 59th. And by that time

the correlation wouldn't be influenced particularly by it.

(Tr. 1036).

At the November 16, 1992 city council meeting, Braman's opinion letter was read into the minutes. (Defendant's exh. P, at 15–16). After further debate, the Euclid City Council passed Ordinance No. 246–1992.

The preamble of 246–1992 states the following rationales for the ordinance:

WHEREAS, Chapter 1377 of the Euclid Codified Ordinances limits accessory uses in residential districts and this Council has found it necessary to further regulate such use; and

WHEREAS, this Council determines and finds that real estate graphics and other commercial graphics installed in the yards of residential districts are detrimental to property values, damaging to neighborhood stability and unnecessary as a mechanism to sell or market real estate of other commercial services; and

WHEREAS, real estate and other commercial graphics are an unneeded commercial intrusion into non-commercial residential neighborhoods; and

WHEREAS, this Council finds and determines that real estate signs, in particular, can damage the image and perception about the viability and desirability of a neighborhood as a good place to live and invest for persons of all races; and

WHEREAS, this Council takes note of a variety of alternative means available to persons working to market real estate and other commercial services, including but not limited to, mailings, flyers, newspaper ads, telemarketing and word of mouth; and

WHEREAS, in harmonious, out-of-scale, or incompatible signs adversely affect property values, discourage economic development, and inhibit public convenience;

WHEREAS, this Council desires to promote and preserve neighborhood aesthetics, peace, health, safety and welfare; and

---

**2.** At trial, Dallos testified that a high percentage of people said "no" in the 1991 survey because they wanted a total lawn sign ban, and not just a ban covering real estate signs. (Tr. 742).

NOW THEREFORE, be it ordained by the Council of the City of Euclid, State of Ohio:

\* \* \* \* \* \*

(Plaintiffs' exh. 1). According to Euclid, the first six whereas clauses represent findings, and the seventh whereas clause, discussing aesthetics, represents the purpose of 246–1992. (Tr. 20).

On December 23, CABOR filed this civil action seeking a temporary restraining order and injunctive relief. Judge George White granted CABOR's motion for a temporary restraining order, and scheduled a preliminary injunction hearing. On January 21, 1993, Judge White recused himself from consideration of this case, and the matter was reassigned to this Court. The parties agreed that the preliminary injunction hearing and the hearing on the merits should be consolidated, and Euclid agreed to suspend enforcement of 246–1992 pending a determination by this Court of the ordinance's validity.

On January 11, 1993, the Euclid City Council amended § 1743.32 to clarify its intent to regulate all commercial signs in residential zoning districts in a similar fashion. As a result, signs identifying home occupations and temporary signs identifying architects, engineers or contractors were covered by the same restrictions placed on real estate signs. This amendment (5–1993) was scheduled to take effect on or about February 10, 1993.

On April 27, 1993, in response to the United States Supreme Court's decision in *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Euclid City Council passed Ordinance No. 80–1993, which amended § 1743.-32(b) and added § 1743.32(c) to the Building and Housing Code.

The third "whereas" clause in 80–1993 states:

WHEREAS, the U.S. Supreme Court departed somewhat from the decisions interpreted to permit preference of noncommercial speech over commercial speech by its decision on March 24, 1993, in *City of Cincinnati v. Discovery Network,* ... which decision henceforth requires equal treatment of core commercial speech with noncommercial speech under the First Amendment to the United States Constitution where the visual pollution, aesthetics, diminution of safety and property values caused by one classification of sign over the other, if any may not be readily calculated; ...

(Plaintiffs' exh. 76, at 1).

Prior to the enactment of Ordinance No. 80–1993, political signs were permitted anywhere on the premises during the seventeen days before, and five days after, a political election. (Plaintiffs' exh. 75, at 3). Ordinance No. 80–1993 required all political signs to conform to the same size and placement restrictions imposed on commercial signs, and allowed residents to place up to five commercial and noncommercial signs in windows, as long as the total area of the signs did not exceed five square feet, and none of the commercial signs contained fraudulent messages. (Plaintiffs' exh. 76, at 1–2). Ordinance No. 80–1993 also allowed residents to display one permanent graphic not exceeding one square foot identifying the name or house number of the resident, and one permanent security notice sign not exceeding one square foot denoting the presence of a home security system. *Id.* Finally, Ordinance No. 80–1993 amended the variance procedure to permit an immediate temporary variance. *Id.* Ordinance No. 80–1993 is scheduled to go into effect on December 1, 1993.

This Court conducted a ten day bench trial beginning on May 4, 1993. At trial, a number of witnesses discussed the ways that homes are marketed. In Euclid, sellers of homes either hire a real estate agent ("realtor"), employ a "Help You Sell" broker, or sell their homes on their own. Realtors are paid a commission that ranges from six (6) to eight (8) percent of the selling price. (Tr. 115). "Help You Sell" brokers are paid a flat fee of around $2,000.00, and assist sellers by placing a sign in the front yard, and by doing the necessary paperwork. (Tr. 103, 105). Both realtors and "Help You Sell" brokers may access the Multiple Listing Service, a computerized listing of homes on the market. (Tr. 102, 105).

The principal methods of home advertising are lawn signs and print advertising (*e.g.*—newspapers, weekly home guides). (Tr. 324). Lawn signs are not an essential tool to market a home. (Tr. 208). This fact is borne out by the fact that realtors are successful selling homes in communities with sign bans. *Id.* However, in one realtor's experience, sellers obtained the greatest price for their homes when they had the greatest exposure—including lawn signs—to inform the public that their homes were for sale. *Id.*

Lawn signs also provide other benefits to buyers and sellers. From a buyer's perspective, the ability to drive around a community and see what homes are on the market provides a modicum of autonomy from realtors. (Tr. 100). In addition, when a buyer sees a lawn sign advertising a home, she also sees the landscaping, the layout of the home, what the neighborhood is like, and the proximity of the home to schools, shopping and other services. (Tr. 320). In contrast, newspaper advertising usually only provides a picture of the home, a description of the home, the location, phone number and asking price. (Tr. 319).

From a seller's perspective, the presence of a lawn sign may create a market. (Tr. 99, 851). A person who is not in the market for a new home may consider buying a home when she finds out a specific home that she likes is on the market. (Tr. 98, 350). In addition, a lawn sign is a less expensive method of advertising a home than print advertising. The cost of a lawn sign and the cost of a classified advertisement are approximately the same: $40.00. (Tr. 350–51). However, a lawn sign has a lifespan of two to three years, while a classified advertisement is only used for a few days, and must be renewed on a regular basis. (Tr. 101–02, 350–51). Because real estate agencies pay for newspaper advertisements (Tr. 850), the cost differential between putting up a lawn sign and using print advertising is borne primarily by residents who sell their homes on their own. In Euclid, roughly 15–20 percent of all homes on the market at any time are "for sale by owner" listings. (Tr. 411).

Councilman Dallos testified that he has received about one hundred complaints from residents concerning the aesthetics of lawn signs since 1989. (Tr. 736). Dallos also testified that, in August, 1992, he received six telephone calls from residents living in the Chardon Road area complaining about three homes that were for sale in the area. (Tr. 773–74). Dallos explained that: "In a block of seven houses, when there is three houses for sale, one, two, three, people are going to question it and raise a concern that there is something wrong with the area." (Tr. 774). Dallos also noted that long time residents (*i.e.*,—people living in an area since 1959 or 1960) "are just always nervous about—when they see a for sale sign go up." (Tr. 775).

Richard Fiorelli, an associate professor of art, provided credible testimony on the issue of aesthetics. Fiorelli stated that repetition, proximity, and mindset were three principles of design that influenced the aesthetic value or visual integrity of a setting. (Tr. 927–29). Fiorelli added that lawn signs were not in harmony with the visual integrity of residential neighborhoods, and that a window sign would be less displeasing than a lawn sign. (Tr. 957, 971, 982).

Grover Gilmore, an expert in visual perception, testified about the visibility and legibility of lawn and window signs. Gilmore stated that:

line of sight refers to the fact that when we are staring straight ahead, of course, we are maximally attending and detecting objects that are directly in front of us. But we are also able to detect objects that are into the periphery of our vision. But there is a tremendous fall off in the detect[sic]ability and discriminability of objects as we move from the center of vision.

So when we move five to ten degrees from the center of vision, we will see that the detection, recognition of objects falls off tremendously. . . .

Q. What is your opinion as to the detectability of a window sign?

A. A window sign will be difficult to detect for a number of reasons.

One is that the windows are not within the direct line of sight of the driver, even the driver who is moving his head and eyes

around to attend to the surfaces near the roadway.

Also the window sign is angled to be, in most cases, parallel to the road surface and that creates a smaller image on the retina than the lawn sign which is perpendicular to the road surface.

Furthermore, the window sign can be obscured by a number of factors such as shrubbery, trees. The window treatment can hide the signs, the mullions in the window, the storm windows, can divide up the surface of the si[gn] to segment it. (Tr. 579–81). This opinion was corroborated by Sharon Friedman, a realtor for Realty One, who noted that window signs were seldomly used by realtors, and were difficult to see from the street (Tr. 210), and by Mayor Lynch, who acknowledged that yard signs were more effective than window signs for the purpose of communicating information (Tr. 81).

On June 2, 1993, the last day of trial, this Court took a 90 minute driving tour of the City of Euclid. (Tr. 1216). This Court was accompanied by counsel for the parties, and by Kay Van Ho, a local real estate agent, who served as driver. (Tr. 1215). On the morning of the tour, Euclid placed thirty bright red real estate signs, which conformed to the size requirements in the sign ordinances, in the windows and screen doors of homes along the route. (Tr. 1216). This effort was intended to demonstrate that the signs were visible and legible from a passing automobile on the street. (Tr. 1216–17). However, this Court found that the driving tour confirmed and reinforced the testimony of Grover Gilmore and Sharon Friedman.

First, despite the relatively small set backs and lot sizes of Euclid homes, and the fact that this Court had the "mindset" to look for window signs (Tr. 939–942), this Court was unable to detect the vast majority of window signs erected by Euclid. In sharp contrast, this Court had no difficulty seeing lawn signs

along the route at significant distances using peripheral vision.

Second, the window signs that were detectable were only visible and legible during the brief moment when the automobile passed directly in front of the house that contained a sign.[3] In order to see a sign, it was necessary to turn and face the house so that the window sign was in the viewer's direct line of sight. Common sense dictates that such behavior could create a traffic safety hazard. The fact that the majority of Euclid homes have small lot sizes exacerbates this problem. After all, if there are fifty houses on a block, spaced closely together, a potential home buyer will spend more time looking for window signs, and less time looking at the road, than he would on a block with only twenty houses.

Third, the variance procedure in Ordinance No. 80–1993 would have little ameliorative effect on the detection problem. Based on this Court's experience during the tour, use of the variance procedure would, in effect, be the exception that swallowed the rule. Moreover, this Court saw very few homes with windows or doors that were totally obstructed by shrubs, trees or other topography, conditions that would justify the granting of a variance.

Therefore, this Court finds that window signs are a completely ineffective alternative to lawn signs, and that the Euclid sign ordinances amount to a *de facto* ban on all commercial and non-commercial signs in residential areas, excluding home address and security signs.

**CONCLUSIONS OF LAW**

### III

The City of Euclid bears the burden of demonstrating a "reasonable fit" between its restrictive ordinance and its justifications for enacting it. *Discovery Network*, —— U.S. at ——, 113 S.Ct. at ——, citing *Board of Trustees of State University of New York v.*

---

**3.** At trial, Euclid highlighted the fact that a window sign conforming to the ordinances could be seen and read from a significant distance. (Tr. 748, 944–45). This Court does not dispute that a person *standing* one hundred feet away from a home could read a window sign. However, the problem this Court encountered during the driving tour was the inability to detect the presence of the majority of the signs from a *moving* vehicle.

*Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989).

■ At trial, Euclid objected to the testimony of John Miller on the ground that he lacked standing to challenge Euclid's sign ordinances. (Tr. 311–14). Euclid noted that prior to trial, Miller moved out of Euclid, no longer owned any property in Euclid, and lacked a "specific present objective harm or a threat of specific future harm" that would satisfy the standing requirements. This Court allowed Miller to testify, and deferred ruling on Euclid's motion for dismissal. (Tr. 315).

Upon consideration of this matter, this Court finds that Miller has standing to bring this action. At the time Ordinance No. 246–1992 was passed, Miller was a resident of Euclid, and was attempting to sell his home on his own. (Tr. 324). Miller subsequently employed a realtor, sold his home in January or February of 1993, and moved to Wickliffe, Ohio. (Tr. 315, 326, 333). Although Euclid is correct that Miller will not suffer a cognizable injury as a result of the enforcement of the Euclid ordinances, this Court concludes that Miller's claim is not mooted because the original injury (*i.e.*—not being permitted to use lawn signs to market his home) is "capable of repetition, yet evading review." *See Speer v. City of Oregon,* 847 F.2d 310 (6th Cir.1988), *citing DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

In Euclid, the average time to market a home is 77 days. (Tr. 161). If this Court adopted Euclid's position that Miller no longer has standing, it is unlikely that any resident who was selling a home on his own could challenge a city's restriction on the placement of "for sale" signs. A resident's claim would be mooted by the sale of the home, an event that would almost invariably occur before the litigation had run its course. In the alternative, a resident contemplating the sale of his home, but who had not actually placed the home on the market, would have to overcome a serious ripeness objection.

Therefore, this Court denies Euclid's motion to dismiss Miller as a plaintiff in this action.

## IV

The parties dispute whether the test for content-based restrictions on speech, the *Central Hudson* commercial speech test,[4] or the content-neutral "time, place, or manner" test should be applied to determine the constitutionality of the Euclid ordinances. The United States Supreme Court, in *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 537 n. 16, 107 S.Ct. 2971, 2981 n. 16, 97 L.Ed.2d 427 (1987), observed that the application of the *Central Hudson* test was "substantially similar" to the test for assessing the validity of time, place, or manner restrictions. *See also Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1525 (Rehnquist, C.J., dissenting) ("time, place or manner" analysis and *Central Hudson* analysis are duplicative). Because of this similarity, this Court will apply the content-neutral time, place or manner analysis.[5]

*Time, Place, or Manner Analysis*

■ A government may place reasonable restrictions on the time, place, or manner of engaging in protected speech, provid-

---

**4.** The United States Supreme Court has defined "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Comm.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). In *Central Hudson,* the Court set forth the following test for commercial speech:

(1) For commercial speech to be afforded protection by the First Amendment, the speech must concern lawful activity and not be misleading;

(2) If the commercial speech is protected, then:

(a) the asserted governmental interest in regulating the speech must be substantial;

(b) the regulation must directly advance the governmental interest asserted; and

(c) the regulation must not be more extensive than is necessary to serve that interest. 447 U.S. at 566, 100 S.Ct. at 2351.

**5.** Because this Court finds that the Euclid sign ordinances are unconstitutional under a content-neutral time, place, or manner analysis, it is unnecessary to apply the more stringent content-based speech analysis.

ed the restrictions: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels for communication of the information. *Clark v. Comm. for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Under a time, place, or manner analysis, the government bears the burden of justifying its impingement on first amendment interests. 468 U.S. at 293 n. 5, 104 S.Ct. at 3069 n. 5.

### A

■ With respect to content neutrality, the principal inquiry is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). In the present case, Euclid has created what appears to be a content-neutral regulatory scheme that prohibits the placement of commercial and non-commercial signs on the front lawns of homes. Euclid's principal justification for the regulations is the desire to improve the aesthetics of residential neighborhoods, and the city as a whole.[6]

■ However, as the United States Supreme Court noted in *Metromedia, Inc. v.*

*City of San Diego,* 453 U.S. 490, 510, 101 S.Ct. 2882, 2894, 69 L.Ed.2d 800 (1981), "esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose."

In support of its position, Euclid places principal reliance on *South–Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868 (7th Cir.), *cert. denied, Greater South Suburban Bd. of Realtors v. Blue Island,* — U.S. —, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992). In *South–Suburban,* six municipalities passed restrictions on the size, placement and number of "for sale" signs. One of the municipalities, University Park, had an ordinance that was similar to Euclid Ordinance No. 246–1992. The University Park ordinance allowed one "for sale" sign in a home's window, and the stated purpose of the statute was "to protect the aesthetically pleasing qualities of the village as a wooded, suburban-rural, and visually open area. . . ."

In upholding the constitutionality of the various ordinances, the *South–Suburban* court noted:

> There is nothing in the record that leads us to conclude that these aesthetic interests, declared in either the preamble or the

---

6. Euclid also argues that the sign ordinances advance its interest in property values, and that homes in other cities with sign bans appreciate at a higher rate than homes in Euclid. In support, Euclid relies on Charles Braman's opinion that the proliferation of real estate signs could adversely affect property values. (Plaintiff's exh. 27, at 1).

This property value argument is not persuasive for a number of reasons. First, it is unclear whether Euclid's concern over property values is a substantial interest justifying the restriction of speech. *See Greater Baltimore Bd. of Realtors v. Hughes,* 596 F.Supp. 906, 921 (D.Md.1984) (the governmental interest in the prevention of an abnormal real estate market with depressed values was not a sufficiently substantial reason to limit commercial speech).

Second, Euclid has failed to demonstrate that the appreciation rates and prices of homes in the Cleveland area are related to the presence or absence of lawn signs. Braman himself acknowledged that a sign had little influence on the sales price of a property. (Tr. 1036).

Third, Braman's opinion letter only dealt with the issue of real estate signs. Euclid has failed to present any credible evidence that the restrictions on other commercial signs (5–1993) and non-commercial signs (80–1993) will advance its stated interest in protecting property values. Therefore, under a time, place, or manner analysis, the Euclid sign ordinances are not "narrowly tailored" to serve its interest in preserving or improving property values.

Finally, Euclid's property value argument hinges on the assumption that window signs are not as visible as lawn signs. If window signs were as visible as lawn signs, then the impact of a proliferation of real estate signs on property values would be unaffected by a regulation that required signs to be moved from the lawn to the window. This Court finds that Euclid's asserted interest in advancing property values merely bolsters this Court's conclusion that the Euclid sign regulations constitute a *de facto* ban on commercial and noncommercial signs, and do not leave open ample alternative methods of communication.

text of the ordinances involved, were not the genuine purposes of each ordinance. *Id.* at 897.

This Court finds that *South–Suburban* is inapposite because the record in this case demonstrates that Euclid's decision to restrict lawn signs was not motivated by a desire to improve the physical appearance of residential neighborhoods. Rather, this Court concludes that, in passing 246–1992, Euclid was principally interested in curtailing the negative messages that are often associated with the proliferation of real estate signs in neighborhoods.

This conclusion is supported by the following facts. First, the December 4, 1991 Real Estate Action Plan suggested that the introduction of sign ordinance legislation was a way to "quiet" the Euclid housing market. (Plaintiffs' Exh. 11, at 2). The issue of aesthetics was not mentioned in the action plan. *Id.* Second, at the September 28, 1992 city council meeting, Cervenik commented:

We have a neighborhood with 10 or 15 signs, the questions are, "Why is everybody moving out?" "What is wrong with this neighborhood?" "Is this not a good city to live in?" "Do they not provide the services we need?" "Is the school system below par, is that why all the people are moving out?" These are the questions that arise. I will tell you right now, it doesn't matter what the real reasons are. It doesn't matter that every single person on Priday had an unexpected transfer out of town, if ten signs on the street raise questions of our school system, neighborhoods and services, then the perception eventually becomes reality and we're all going to pay the price in house values and strong neighborhoods.

(Plaintiffs' exh. 6, at 1–2).

At the same meeting, Koran added:

A single family home is an average person's largest investment in their lifetime. When you buy a home it's something you consider, you stay up nights thinking about this investment. If you are looking for a home, drive down the street and see eight real estate signs on a street with sixteen homes on it, the first thing you think of is

there's a problem here, whether it's services, schools or whatever. You really don't care what the problem is, but you're going to look on another street that does not have one out of two homes for sale. I feel that's the important issue, the perception of the neighborhood, when you drive down the street and see sign after sign, after sign, you're not going to buy a home on that street.

(Plaintiffs' exh. 6, at 5).

Third, only 200 of the 16,000 housing units in Euclid (1.2 percent) have "for sale" signs on the lawns at any given time. (Tr. 161). Furthermore, the October 1992 survey of 200 Euclid residents revealed that the majority of respondents did not consider lawns signs to be a problem, and did not believe that lawn signs should be regulated. (Plaintiffs' exh. 8). The results of this survey were consistent with Dallos' 1991 survey of Ward 4 residents. (Defendant's exh. II–K). Despite these results, the city council proceeded to pass Ordinance No. 246–1992.

Fourth, the October 22, 1992 letter from Oyaski to Carey, which related to "yard sign issues," discussed fair housing issues, but not aesthetics issues. (Plaintiffs' exh. 62). Fifth, the preamble of Ordinance No. 246–1992 indicates that Euclid was concerned about the *message* conveyed by real estate lawn signs:

this Council finds and determines that real estate signs, in particular, can damage the image and perception about the viability and desirability of a neighborhood as a good place to live and invest for persons of all races.

(Plaintiffs' exh. 1, at 1).

Finally, one week before trial, the Euclid city council extended the regulation of lawn signs to include non-commercial graphics (80–1993), in response to the *Discovery Network* opinion. The decision to pass Ordinance No. 80–1993 at this time was primarily based on a desire to protect Euclid's interest in this litigation, and not as a part of a larger plan to promote aesthetics. (Plaintiffs' exh. 76, at 1). At the April 19, 1993 council meeting, Councilman Jerse stated:

When we discussed this real estate ban back in December, Mr. Oyaski told us

there was a case pending before the U.S. Supreme Court, and frankly, we should have waited because now if we had waited we could have considered the implications of the legislation as they truly were. *When we debated these at length before the public when we passed it, there was no discussion at any length about political signs, nobody talked about that. We talked about real estate signs, period.*

(Plaintiffs' exh. 72, at 6–7) (emphasis added).

Although Euclid's regulation of signs, as currently constituted, appears to be content neutral, this Court finds, based on substantial evidence in the record, that it is more likely than not that Euclid "has adopted a regulation of speech because of disagreement with the message it conveys": the perception that people are leaving certain Euclid neighborhoods in large numbers. Therefore, this Court concludes that the Euclid sign ordinances fail the first prong of the time, place, or manner test, and are violative of the first amendment.

### B

■ Assuming *arguendo* that the Euclid sign ordinances are content neutral, and are based on an aesthetics rationale, this Court will consider the other prongs of the time, place or manner analysis. With respect to the second prong, this Court finds that the promotion of aesthetics is a significant governmental interest. *See Metromedia,* 453 U.S. at 507–08, 101 S.Ct. at 2892–93; *Rzadkowolski v. Village of Lake Orion,* 845 F.2d 653, 655 (6th Cir.1988); *Wheeler v. Kentucky Comm'r of Highways,* 822 F.2d 586, 594 (6th Cir.), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988).

This Court also finds that the Euclid residential sign ordinances are narrowly tailored to serve that interest. Although Euclid did not attempt to regulate the size, color, or shape of lawn signs, narrowly tailoring a statute "does not require elimination of all less restrictive alternatives." *See Board of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 478, 109 S.Ct. 3028, 3033–34, 106 L.Ed.2d 388 (1989) (with respect to the narrowly tailoring requirement, the Supreme

Court has "been loath to second-guess the Government's judgment").

At trial, Fiorelli testified that aesthetics would be advanced by placing lawn signs in closer proximity to the home. (Tr. 928, 985). Fiorelli added that the repetition of shapes and other images (*e.g.*—a rectangular sign framed by a rectangular window) contributed to the visual integrity of the whole. (Tr. 928, 932–33). Moreover, the *South–Suburban* court observed:

There can be little doubt that the limitations on the number of "for sale" signs per property found in the ordinances ... advance concerns for proper physical appearance. A proliferation of signs in a residential community certainly detracts from the beauty of that community. Likewise, the restrictions on the size of signs ... facilitate aesthetic concerns. A large sign is a greater intrusion on a residential neighborhood's appearance than is a smaller sign. Finally, the sign placement provisions ... contribute to neighborhood beauty. Uniform placement of signs in the window of a home or a regulated distance from it insures that the signs will not prove as unsightly as haphazard placement.

935 F.2d at 897. This reasoning is equally applicable to other types of commercial signs (5–1993), and to noncommercial signs (80–1993).

### C

■ The third prong of the time, place or manner analysis requires that restrictions on speech "leave open ample alternative channels for communication of the information." This Court concludes that the Euclid sign ordinances fail to satisfy this requirement. In *Linmark Assoc., Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the United States Supreme Court struck down a content-based restriction prohibiting the posting of real estate "for sale" and "sold" signs in residential neighborhoods. The restriction was passed to stem the perception that white homeowners were leaving a racially integrated neighborhood.

In applying the time, place or manner analysis, the *Linmark* Court wrote:

[S]erious questions exist as to whether the ordinance "leave[s] open ample alternative channels for communication." Although in theory sellers remain free to employ a number of different alternatives, in practice realty is not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated—primarily newspaper advertising and listing with real estate agents—involve more cost and less autonomy than "For Sale" signs; are less likely to reach persons not deliberately seeking sales information; and may be less effective media for communicating the message that is conveyed by a "For Sale" sign in front of the house to be sold. The alternatives, then, are far from satisfactory.

431 U.S. at 93, 97 S.Ct. at 1618.

In the present case, this Court concludes that window signs are a completely ineffective alternative channel of communication to lawn signs.[7] See Baldwin v. Redwood City, 540 F.2d 1360, 1372 n. 34 (9th Cir.1976), cert. denied, sub nom. Leipzig v. Baldwin, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) ("allowing [political] signs only if they are inside a house and three feet back from windows is equivalent to not allowing signs at all"). Because the Euclid sign ordinances constitute a de facto ban, home sellers are faced with a choice of taking out newspaper advertisements, or utilizing real estate agents or "Help You Sell" brokers. These options are more costly, and offer less autonomy to sellers. For residents selling their homes on their own, the Euclid sign ordinances remove one of the two principal methods of home advertising. This is especially significant in Euclid, where approximately 15–20 percent of real estate listings at any one time are "for sale by owner" listings.

Although this Court finds that window signs are an ineffective method of communication, this Court does not believe that all ordinances that restrict the placement of signs to windows would violate the first amendment. Rather, this Court's decision is also based on the following considerations: (1) there is substantial evidence that aesthetics was not the motivating reason behind the passage of the Euclid sign restrictions; and (2) a significant percentage of Euclid home listings are "for sale by owners," and these residents will be impacted the most by a restriction that prohibits the use of lawn signs.

With respect to political signs, Euclid argues that there are ample alternative methods of communication, including knocking on doors, mailings, newspapers, public appearances, private gatherings, and the use of window signs. (Tr. 494, 538–39, 754–55, 1070–71). However, in Baldwin, 540 F.2d at 1368, the court noted that:

[M]eans of political communication are not entirely fungible; political posters have unique advantages. Their use may be localized to a degree that radio and newspaper advertising may not. With [the] exception of handbills, they are the least expensive means by which a candidate may achieve name recognition among voters in a local election.

See also City of Euclid v. Mabel, 19 Ohio App.3d 235, 484 N.E.2d 249, 253 (1984), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985) (court struck down content-based restriction on political lawn signs, noting that "[l]awn signs as a medium of communication are unique.").

Based on the finding that window signs are not an effective method of communication, this Court concludes that Euclid has failed to demonstrate that the sign ordinances provide ample alternative channels of communication, as required under the third prong of the time, place or manner analysis.

**V**

In sum, this Court concludes that John Miller has standing to sue, and that the

---

7. In *South–Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors,* 713 F.Supp. 1068 (N.D.Ill.), *aff'd in part, rev'd in part,* 935 F.2d 868 (7th Cir.1991), the district court held that the University Park ordinance, which permitted the placement of one "for sale" sign in a window, was constitutional under a time, place, or manner analysis. 713 F.Supp. at 1092–93. However, the district court did not make any finding concerning the visibility or legibility of window signs. *Id.* at 1090–91 (sign regulations were "modest and reasonable."). Therefore, this Court finds that the *South–Suburban* decision is not controlling.

**1266**

Euclid sign ordinances violate the first amendment of the United States Constitution because they are not content-neutral, and do not leave open ample alternative channels of communication.

Accordingly, this Court: denies Euclid's motion to dismiss Miller from this action; permanently enjoins the enforcement of Euclid Ordinances Nos. 246–1992, 5–1993 and 80–1993; and enters final judgment in CABOR's favor.

IT IS SO ORDERED.