**CLEVELAND AREA BOARD OF REALTORS, et al., Plaintiffs–Appellees,**

v.

**The CITY OF EUCLID, Defendant–Appellant.**

No. 93–4209.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1995.

Decided July 8, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 19, 1996.

Arthur M. Kaufman (briefed), Robert J. Fogarty (argued), and Robert Kochis, Hahn, Loeser & Parks, Cleveland, OH, for plaintiff–appellee.

Richard A. Wiegand (argued and briefed), City of Euclid, OH, for defendant–appellant.

Before: KENNEDY and DAUGHTREY, Circuit Judges; CLELAND, District Judge.*

DAUGHTREY, J., delivered the opinion of the court, in which CLELAND, J., joined. KENNEDY, J. (pp. 391–92), delivered a separate opinion concurring in part and dissenting in part.

DAUGHTREY, Circuit Judge.

The defendant, the City of Euclid, Ohio, appeals from the district court's judgment in an action filed by the Cleveland Area Board of Realtors that challenged the validity of certain City ordinances regulating the size, number, and placement of signs in residential neighborhoods, as violative of the First Amendment's free speech clause. The district court found that the ordinances were invalid, primarily because they were not content-neutral but also because—even if content-neutral—they were not narrowly tailored. For the reasons stated below, we affirm the district court's judgment.

## I. FACTUAL BACKGROUND

Before the ordinances at issue were enacted, the City allowed signs anywhere in a residential yard but limited them to five square feet. In November 1992, the first challenged ordinance, No. 246–1992, restricted the placement of real estate "For Sale" signs to the windows of homes in residential

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

areas, and limited the size of those signs to three square feet if the house were within 75 feet of a street and four square feet if the house was more than 75 feet away. A variance procedure was included for homes with obstructed views to their windows. The preamble to the original ordinance listed its rationales in the following section:

WHEREAS, Chapter 1377 of the Euclid Codified Ordinances limits accessory uses in residential districts and this Council has found it necessary to further regulate such use; and

WHEREAS, this Council determines and finds that real estate graphics and other commercial graphics installed in the yards of residential districts are detrimental to property values, damaging to the neighborhood stability and unnecessary as a mechanism to sell or market real estate or other commercial services; and

WHEREAS, real estate and other commercial graphics are an unneeded commercial intrusion into non-commercial residential neighborhoods; and

WHEREAS, this Council finds and determines that real estate signs, in particular, can damage the image and perception about the viability and desirability of a neighborhood as a good place to live and invest for persons of all races; and

WHEREAS, this Council takes note of a variety of alternative means available to persons working to market real estate and other commercial services, including but not limited to, mailings, flyers, newspaper ads, telemarketing and word of mouth; and

WHEREAS, in harmonious [sic], out-of-scale, or incompatible signs adversely affect property values, discourage economic development, and inhibit public convenience; and

WHEREAS, this Council desires to promote and preserve neighborhood aesthetics, peace, health, safety and welfare. . . .

The Cleveland Area Board of Realtors ("CABOR") and several realty companies

sued under 42 U.S.C. § 1983, alleging that the City had violated the First Amendment by enacting the ordinance. The complaint sought a declaratory judgment that the ordinance was unconstitutional under the First Amendment, the due process clause, and the equal protection clause of the United States Constitution, as well as the Ohio Constitution.[1] CABOR requested an injunction and expenses in bringing suit.

After CABOR sued in December 1992 and was granted a temporary restraining order, the city council amended the ordinance ten days before trial was scheduled, to apply to all commercial signs except those indicating the name and address number of the homeowner and those temporarily displaying the name of an architect, engineer, or contractor at work (Ordinance No. 5–1993). Trial of the case was rescheduled, and a week before it finally began, the council once again amended the ordinance, this time to cover all yard signs, commercial and non-commercial, except those displaying the residents' name and address and pertinent security system information. The preamble to this final ordinance, No. 80–1993, noted the city council's desire

. . . to maintain property values, maintain open space and a residential atmosphere in residential neighborhoods, prevent the nuisance of visual pollution and proliferation of signs, and limit the intrusion of commercial atmosphere in residential use districts.

The final ordinance also indicated that it was enacted to conform to a recent Supreme Court case, *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), which the preamble interprets to

. . . require[ ] equal treatment of core commercial speech with noncommercial speech under the First Amendment . . . where the visual pollution, aesthetics, diminution of safety and property values caused by one classification of sign over another, if any, may not be readily calculated. . . .

After a ten-day bench trial, the district court reviewed the ordinances as a whole and

---

1. The district court declined to rule on any issues other than the free speech question and that is the only issue presented on appeal.

applied the test for "time, place, or manner" restrictions on speech, inquiring into whether the restrictions were content-neutral, whether they were narrowly tailored to serve a substantial government interest, and whether they left open ample alternative channels of communication. With regard to whether they were content-neutral, the court found that although the City's stated "principal justification" for the ordinances was to improve the City's appearance, the facts showed that the City's actual motivation was not to improve aesthetics but to "curtail[ ] the negative messages that are often associated with the proliferation of real estate signs in neighborhoods." *Cleveland Area Bd. of Realtors v. The City of Euclid*, 833 F.Supp. 1253, 1264 (N.D.Ohio 1993). In making this finding, the court first relied on a 1991 "Real Estate Action Plan" to the Mayor from the Director of Community Services. The plan focused on promoting Euclid as a place to live, but included a suggestion for sign ordinance legislation to "quiet" the housing market. The plan did not mention aesthetics, but focused on the problem of realtors "steering" customers. In addition to the 1991 plan, the court relied on the comments of the ordinances' sponsor, Councilman Cervenik, and Kory Koran, the Director of Euclid's Community Services, who expressed concern over the perception that "For Sale" signs create. The court also noted that a 1992 survey of 200 residents indicated that a majority of residents did not approve sign legislation and that a 1991 survey by Councilman Dallos was consistent with that survey. The court relied upon a letter from the City's Director of Law, Paul Oyaski, to Patricia Carey, CABOR's Director of Government Affairs, discussing the yard sign issue in terms of fair housing rather than aesthetics. In addition, the court observed that the original ordinance's preamble acknowledged the council's concern over the perception that real estate signs create. Finally, the court opined that the final ordinance in response to *Discovery Network* was passed a week before trial to protect the City's interest in this case rather than to promote aesthetics by including noncommercial signs within the ambit of the regulations. For these reasons, the court concluded that the ordinances were content-

based regulations designed to intercept the negative messages that real estate signs convey. *Id.* at 1264.

The court also found that even if the ordinances were content-neutral, and despite the fact that they could be found to be narrowly tailored to serve a significant interest in aesthetics, they did not leave open ample alternative channels for speech. This finding was based in part on expert testimony offered at trial concerning such things as the relative visibility of window signs. Moreover, after a driving tour of Euclid, the district judge determined that window signs were ineffective as an alternative method of communication and that the lawn sign ordinances were therefore a *de facto* ban on residential signs. Because the district judge found the remaining options for a real estate seller to be more costly and to provide less autonomy to the seller by requiring an agent, she viewed the ordinances as offering inadequate alternatives. In addition, the district judge found the alternatives to political signs, such as door-to-door knocking, mailings, newspaper advertising, public appearances, private gatherings, and window signs as "completely inadequate" replacements for yard signs. Therefore, the court struck the ordinances as violative of the First Amendment. *Id.* at 1264–66.

## II. ANALYSIS

### A. *The Appropriate Constitutional Standard*

■ The district court analyzed the comprehensive scheme established by the three ordinances as a "time, place, and manner" restriction on speech. It therefore asked whether they are "justified without reference to the content of the regulated speech, [whether] they are narrowly tailored to serve a significant governmental interest, and [whether] they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984).

The City argues that the district court should have applied the test for restrictions on commercial speech to the first two ordi-

nances, which addressed only commercial signs, and should have reserved the "time, place, and manner" analysis for the final ordinance, which included non-commercial signs. The test for purely commercial speech, as articulated in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980), indicates that commercial speech is protected only if it concerns lawful activity and is not misleading. If the speech is protected, then the government may regulate it only if the government has a substantial interest, if the regulation directly advances that interest, and if the regulation is no more extensive than necessary to serve that interest. *Id.* The City insists that the district court erred by refusing to apply this commercial speech test to the first two ordinances.

We conclude that this issue is moot. By the time trial took place, the first two ordinances no longer operated independently because the final ordinance had created a regulation restricting both commercial and non-commercial yard signs. Indeed, in its brief before this court, the City described the three ordinances as a "comprehensive sign ordinance which applies even-handedly to all types of signs found in residential neighborhoods." We conclude that use of the commercial speech test would be inappropriate, as well as unhelpful, and we therefore decline to invoke it for purposes of deciding the constitutional issues presented in this case.

## B. *Content-Neutrality*

Under the "time, place, and manner" analysis, the first question the court must ask is whether the ordinances are content-neutral. The district court concluded that they were content-based, finding that the city council enacted them to combat the "negative messages" that "For Sale" signs create. The court quoted *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510, 101 S.Ct. 2882, 2894, 69 L.Ed.2d 800 (1981), for the proposition that

> ... esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a

public rationalization of an impermissible purpose.

The district court concluded that the City had "more likely than not" enacted the ordinances to ameliorate any negative messages that a proliferation of "For Sale" signs might convey. It also distinguished this case from the facts of *South–Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868 (7th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992), which upheld a real estate sign ban after accepting that aesthetics was the true rationale for the City's ordinance. In this case, the court concluded that aesthetics was not the real motive for the legislation. Thus, the district court found that Euclid's ordinances failed the first prong of the test for "time, place, and manner" restrictions.

CABOR seeks to uphold this finding of fact as not clearly erroneous under Fed.R.Civ.P. 52(a). It insists that the record "overwhelmingly supports" the district court's finding that the City was not motivated by a desire to improve its aesthetics, but rather a desire to curb "white flight" and maintain property values. Following the district court's lead, it cites *Metromedia* as requiring careful scrutiny when "aesthetics" is the rationale for legislation. CABOR further notes that in *Edenfield v. Fane*, 507 U.S. 761, 768, 113 S.Ct. 1792, 1799, 123 L.Ed.2d 543 (1993), in reviewing a ban on in-person solicitations by accountants under the commercial speech test, the Supreme Court stated that it would not "turn away if it appears that the stated interests are not the actual interests served by the restriction."

In response, the City insists that the district court wrongly inquired into legislative motives for the ordinances. It argues that Supreme Court case law rejects inquiry into the minds of legislators, because they may vote for legislation for a variety of reasons. Under *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968), the City argues, a court should not invalidate an otherwise valid law because of the comments of a few legislators. Moreover, the City insists that even if an improper motive were a substantial reason for the ordinances, the legislation must be

upheld if it would have been passed in the absence of the improper motive. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

We conclude that the district court erred, as a matter of law, by concluding that Euclid's ordinances are content-based. Although the record establishes that one of the City's motivations for the ordinances was to stem "panic selling," the district court's total rejection of the City's stated aesthetics rationale—a rationale that is voiced in the record and appears in the legislation itself, including the preamble to the original ordinance (No. 246–1992)—is clear error when considered in light of the limited inquiry that case law permits when reviewing legislative motive.

As an initial matter, we note that the language in *Metromedia* on which CABOR relies for the proposition that motive is relevant in determining content-neutrality is *dictum.* In that case, the city ordinance that the Court deemed unconstitutional on its face permitted on-site advertising, but prohibited other commercial advertising and non-commercial communication using fixed-structure signs everywhere, unless permitted by a specific exception. The purported rationale was aesthetics, and the plurality stated that "[s]uch esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Metromedia,* 453 U.S. at 510, 101 S.Ct. at 2894. However, the plurality also noted that "there is no claim in this case that San Diego has an ulterior motive in the suppression of speech." *Id.* Because there was no claim in *Metromedia* that an underlying motive to suppress a certain type of speech was present, the Court did not have to consider the issue. Consequently, even if this portion of the opinion were endorsed by a majority of the Court—a conclusion that seems doubtful—it would not constitute binding precedent.

■ Legislation constitutional on its face will generally not be voided based on the motives or purposes of those enacting it. *O'Brien,* 391 U.S. at 383–84, 88 S.Ct. at 1682–83; *Zilich v. Longo,* 34 F.3d 359, 363

(6th Cir.1994)("We may not invalidate such legislative action based on the allegedly improper motives of legislators."). In *O'Brien,* involving the Supreme Court's decision to uphold the constitutionality of a statute prohibiting the destruction of draft cards, O'Brien argued that the statute was designed to suppress speech. The Court responded:

It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. * * * Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance.... It is an entirely different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

*Id.* at 383–84, 88 S.Ct. at 1682–83.

■ Similarly, in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court relied on *O'Brien* when it upheld a city ordinance regulating the location of adult theaters on the ground that Renton sought to regulate the "secondary effects" of the theaters rather than the content of their speech. Rejecting the lower court's decision to strike the ordinance because a motivating factor was the suppression of speech, the Court relied on *O'Brien's* language refusing to study legislative motives. The Court insisted that the ordinance was content-neutral because it was *"justified* without reference to the content of the regulated speech." *Id.* at 48, 106 S.Ct. at 929. Similarly, because Euclid's "time, place, and manner" restriction on signs is justified

on the basis of aesthetics without reference to the content of the signs, it must be considered content-neutral under *Renton* and *O'Brien*. We therefore decline to invalidate the ordinances on the basis of their asserted lack of content-neutrality, based in turn on the motives of the council members that enacted those ordinances.

### C. *Narrow Tailoring*

The second inquiry under the "time, place, and manner" test is whether the ordinances are "narrowly tailored to serve a significant government interest." *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. The district court found that the ordinances were narrowly tailored to achieve a significant interest, citing cases suggesting the importance of aesthetics, as well as evidence and case law indicating that sign restrictions will advance that interest. However, in determining whether the ordinances were "narrowly tailored," the district court put undue emphasis on the rationale of *South–Suburban,* 935 F.2d at 897, in which the Seventh Circuit evaluated the constitutionality of "For Sale" sign regulations for aesthetic reasons. The district court relied on extensive language in *South–Suburban* applying the commercial speech test to determine whether the ordinance "directly advanced" the government's aesthetic interest. Such a finding does not establish that the ordinance was narrowly tailored, however, and we conclude that *South–Suburban* is not a reliable guide in determining whether Euclid's ordinances covering both commercial and non-commercial speech are sufficiently narrowly tailored to withstand constitutional scrutiny.

Case law recognizes that aesthetics may constitute a significant government interest. *Metromedia,* 453 U.S. at 507–08, 101 S.Ct. at 2892–93. However, the wholesale ban on lawn signs in the name of aesthetics in this case is, simply, not sufficiently narrowly tailored to withstand constitutional scrutiny. Indeed, it appears that the regulation is not "tailored" at all. In order for an ordinance to be "narrowly tailored," the legislature does not have to have eliminated all less restrictive alternatives. *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S.

469, 478–79, 109 S.Ct. 3028, 3033–34, 106 L.Ed.2d 388 (1989). Nevertheless, the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 478, 109 S.Ct. at 3034 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)). *Fox* stated:

> What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish to those ends," ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served"....

*Id.* at 480, 109 S.Ct. at 3035. For example, in reviewing an ordinance that limited property owners to two signs, the Fourth Circuit observed that the county could have promoted its aesthetic interests much less restrictively by regulating only the design and condition of signs, the distance of signs from the street, and the length of time that signs are posted. *Arlington County Republican Committee v. Arlington County, Virginia,* 983 F.2d 587, 595 (4th Cir.1993). The Fourth Circuit concluded that the two-sign ordinance was not narrowly tailored. In this case, by banning yard signs altogether, with an exception only for a minimal amount of information necessary for safety and security reasons, the government burdened substantially more speech than necessary, because it completely foreclosed an inexpensive and autonomous way to communicate.

### D. *Alternative Channels of Communication*

Finally, this court must ask whether the ordinances "leave open ample alternative channels for communication of the information." *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. The district court found that window signs are "a completely ineffective alternative channel of communication to lawn signs." *See Baldwin v. Redwood City,* 540 F.2d 1360, 1372 n. 34 (9th Cir.1976), *cert. denied sub nom. Leipzig v. Baldwin,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Because the ordinances effectively ban communication from signs posted at one's home, the court

concluded that home-sellers are forced to market their homes using more costly and less autonomous methods, such as real estate agents and newspaper advertising. Owners who want to sell without an agent are severely impaired. Moreover, relying again on *Baldwin* and *City of Euclid v. Mabel,* 19 Ohio App.3d 235, 484 N.E.2d 249, 253 (1984), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985), which note the uniqueness of political lawn signs, the court found that alternative methods of communication are inadequate substitutes for political lawn signs.

We agree with the district court's conclusion. The Supreme Court recently acknowledged the unique place of yard signs in *City of Ladue v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), in which it declared unconstitutional a city ordinance banning almost all signs with certain exceptions, including real estate signs, house identification signs, signs for churches and other religious institutions, signs for schools, and commercial signs in commercial districts. The Court agreed with the court of appeals's finding that Ladue's justification based on aesthetics was not sufficiently compelling to warrant the content-based ordinance. Nevertheless, the Court reviewed the case as if the ordinance was content-neutral, and found it too broad. The City stated that:

> Ladue has almost completely foreclosed a venerable means of communication that is both unique and important. It has totally foreclosed that medium to political, religious, or personal messages. Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community. Often placed on lawns or in windows, residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes. They may not afford the same opportunities for conveying ideas as do other media, but residential signs have long been an important and distinct medium of expression.

*Id.* at ——, 114 S.Ct. at 2045. The Court noted its concern with foreclosing an entire medium of communication and added that even if the ordinance were a "time, place, or manner" restriction, it did not leave open ample alternatives. The Court wrote:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the "speaker." As an early and eminent student of rhetoric observed, the identity of the speaker is an important component of many attempts to persuade. A sign advocating "Peace in the Gulf" in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10–year–old child's bedroom window or the same message on a bumper sticker of a passing automobile. An espousal of socialism may carry different implications when displayed on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board.
>
> Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute.... Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in from of one's house with a handheld sign may make the difference between participating and not participating in some public debate. Furthermore, a person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means.
>
> A special respect for individual liberty in the home has long been part of our culture and our law ...; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there....

*Id.* at —— ——, 114 S.Ct. at 2046–47. The Court indicated that it might have approved "more temperate measures," *id.* at ——, 114 S.Ct. at 2047, but that Ladue had banned almost all signs. Although the Ladue ban included signs in windows and, thus, is distin-

guishable from Euclid's ordinances in this way, the record in this case contains, among other things, a finding that, as utilized in Euclid's neighborhoods, window signs are ineffective. Given this finding of fact and *Ladue*'s reverence for residential signs, Euclid's ordinances can hardly be said to permit adequate alternatives.

In addition to *Ladue*, the Supreme Court has stated in *dicta* that a ban on real estate yard signs offers insufficient alternatives. In *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court reviewed an ordinance banning "For Sale" signs in order to prevent "white flight." Viewing the ordinance as a restriction on commercial speech, the Court found the restriction unnecessary as a method of achieving a successfully integrated community and impermissible as a restriction on free speech. In addition, the Court responded to Willingboro's argument that the ordinance was a legitimate "time, place, and manner" restriction by insisting that

> ... serious questions exist as to whether the ordinance "leave[s] open ample alternative channels for communication".... Although in theory sellers remain free to employ a number of different alternatives, in practice realty is not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated—primarily newspaper advertising and listing with real estate agents—involve more cost and less autonomy than "For Sale" signs ...; are less likely to reach persons not deliberately seeking sales information ...; and may be less effective media for communicating the message that is conveyed by a "For Sale" sign in front of the house to be sold.... The alternatives, then, are far from satisfactory.

*Id.* at 93, 97 S.Ct. at 1618. This *dicta* bolsters the conclusion, reached below and here, that inadequate alternatives exist for real estate yard signs.

Although *Ladue* indicated that a city could regulate signs constitutionally, *see* —— U.S. at ——, 114 S.Ct. at 2047, Euclid's ordinances do not appear to be such constitutional ordinances. The district court found window signs to be a "completely ineffective" substitute for yard signs. Homeowners wishing to sell without an agent would be relegated to newspaper advertising under this ordinance, prohibiting them from attracting potential buyers who were not actively shopping. The use of agents is a considerably more expensive alternative. With regard to other commercial signs, such as "yard sale" signs, alternatives are even more limited because agents are unavailable for many commercial activities. Finally, with regard to non-commercial speech, the sign ordinances greatly restrict a speaker's audience, restrict the effectiveness of speech, and relegate speakers to far more expensive means of communication. For these reasons, Euclid's sign ordinances must be declared unconstitutional.

In reaching this conclusion, we join many other courts that have struck down bans on yard signs. *See, e.g., City of Ladue v. Gilleo*, —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (ordinance banned residential signs except for identification, security, or real estate signs); *Arlington County Republican Comm. v. Arlington County*, 983 F.2d 587 (4th Cir.1993) (ordinance limited owners to two signs); *Matthews v. Town of Needham*, 764 F.2d 58 (1st Cir.1985) (ban on political signs); *Citizens United for Free Speech II v. Long Beach Township Bd. of Comm'rs*, 802 F.Supp. 1223 (D.N.J.1992) (ban on real estate signs); *Runyon v. Fasi*, 762 F.Supp. 280 (D.Haw.1991) (ban on political signs); *Eastern Bergen County Bd. of Realtors, Inc. v. Borough of Fort Lee*, 720 F.Supp. 51 (D.N.J. 1989) (ban on real estate signs); *Prus v. City of Chicago*, 711 F.Supp. 469 (N.D.Ill.1989) (restrictions on commercial signs in residential neighborhoods); *Greater Baltimore Bd. of Realtors v. Hughes*, 596 F.Supp. 906 (D.Md.1984) (real estate sign ban); *City of Antioch v. Candidates' Outdoor Graphic Serv.*, 557 F.Supp. 52 (N.D.Cal.1982) (time limit on political signs); *Daugherty v. City of E. Point*, 447 F.Supp. 290 (N.D.Ga.1978) (ban on residential signs except for identification, safety, or political purposes); *Ross v. Goshi*, 351 F.Supp. 949 (D.Haw.1972) (political sign ban).

For the reasons stated above, we AFFIRM the judgment of the district court.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur in parts A, B and C of the panel's opinion.

I concur in the court's holding that the ordinance violates the First Amendment. However, I do so because I do not believe the City of Euclid's ordinance is content neutral. While prohibiting free standing "for sale" signs, the ordinance permits free standing security signs. I am unable to find a countervailing government interest to justify the distinction between the contents of security signs and "for sale" signs. The purpose of security signs is to convey to would-be burglars that the house has an alarm system. That message can be conveyed to burglars, who presumably look around the premises before attempting to enter, by window signs in the same manner "for sale" messages are conveyed. Because, as the Supreme Court noted in *City of Ladue v. Gilleo,* —— U.S. ——, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), this exception could easily be removed, I have discussed my disagreement with the panel on the other issues raised.

First, I do not agree that the City of Euclid's ordinance banning lawn signs is not sufficiently narrowly tailored. The majority suggests that the ordinance is not narrowly tailored because it almost entirely bans yard signs, which is unnecessary to further the government's interest. While I agree with the panel that the restrictions on speech should not "burden substantially more speech than is necessary to further the government's legitimate interests," Maj. Op. at 388 (quoting *Board of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 478, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989)), Euclid's ordinance does not burden speech more than necessary to further the City's legitimate interest in maintaining lawns in single family residential areas free of signs for aesthetic purposes.

So long as the means chosen are not *substantially* broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. *"The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.*

*Ward v. Rock Against Racism,* 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (emphasis added) (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985)). The aesthetic objective of front lawns free of signs cannot be achieved other than by a complete ban on such signs, for lawn signs are the very visual pollutant that the City wishes to prevent. Therefore, I conclude that the ordinance's virtually complete ban on yard signs is not broader than is necessary to achieve the government's interest.

Nor can I agree with the panel that the ordinance fails to "leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). The panel does not discuss other alternative methods of communication but instead relies on the District Court's finding that window signs are an inadequate alternative. However, whether there are ample alternative methods of communication is, I believe, a constitutional fact subject to independent appellate review. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1983).

The ordinance does not ban all signs on the premises. It expressly permits window signs, which are valid methods of communication. The evidence was undisputed that signs of the size permitted could be read even in low luminous conditions at 185 feet if letters four inches in height were used. The window signs would be no more than 75 feet from the street. (If farther, or if the terrain would obscure a window sign, a lawn sign was permitted.) Admittedly, lawn signs are more visible than window signs. Indeed, the very fact that lawn signs attract one's atten-

tion is the reason they cause visual clutter and detract from the aesthetics of the residential area.

Nonetheless, window signs are an effective alternative channel for communication. The evidence presented by the City established that, in communities adjacent to Euclid that have limited signs in residential areas to window signs for some time, persons were able to sell their homes. Moreover, those people selling their homes may pursue other effective channels of communication such as listing their homes in newspapers and with real estate brokers. Although window signs require prospective buyers to pay closer attention to determine whether a house is for sale, buying a house is not ordinarily impulse driven. Therefore, the prohibition of yard signs leaves open ample alternative channels to communicate that property is for sale or that a homeowner supports a particular candidate or issue.

The final question is whether lawn signs have become such a traditional means of communication by homeowners that they must be permitted under the teaching of *Ladue*. In *Ladue*, the city permitted no signs except for "for sale," residence identification, and warning signs. Plaintiff Gilleo wished to display political signs opposing the Gulf War. After discussing why the ordinance was not content neutral, but concluding that the City of Ladue could easily eliminate those exceptions and if it did so Gilleo would be without a remedy, the Court went on to hold that the complete prohibition of all residential signs would be a violation of the First Amendment. The Court noted that measures more temperate than prohibiting all residential signs could in large part satisfy Ladue's stated state regulatory needs without harm to the First Amendment rights of its citizens. In a footnote, the Court pointed out that it was "not confronted here with mere regulations short of a ban." *City of Ladue,* —— U.S. at —— n. 17, 114 S.Ct. at 2047 n. 17. Here, the City of Euclid has not banned all residential signs. Homeowners are not prevented from displaying their messages. Euclid has instead regulated their placement to on the residence when they are visible from the street or sidewalk rather than in the yard. The ordinance here is a regulation, not a ban. Thus, I do not believe *Ladue* mandates that yard signs must also be allowed.